## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AMBER BLUNT,** on behalf of herself and all others similarly situated, | |
| **CRYSTAL BLUNT** and **MICHAEL BLUNT**, on their own behalf and on behalf of all others similarly situated, | |
| **LINDA JOHNSON**, on her own behalf, on behalf of her daughter, **LYDIA JOHNSON**, and all others similarly situated, | Civil Action No. |
| **CAROL DURRELL**, on her own behalf, on behalf of her minor daughter, **SALEEMA HALL**, and on behalf of all others similarly situated, | **Class Action Complaint** |
| **CHRISTINE DUDLEY**, on her own behalf, and on behalf of her minor son, **WALTER WHITEMAN**, and on behalf of all others similarly situated, | **Jury Demand** |
| **ERIC ALLSTON** on his own behalf and on behalf of all others similarly situated, | |
| **THE CONCERNED BLACK PARENTS, INC.,** | |
| **THE MAINLINE BRANCH OF THE NAACP,** | |
| *Plaintiffs* | |
| vs. | |
| **LOWER MERION SCHOOL DISTRICT,** | |
| **JAMIE SAVEDOFF,** Superintendent, in his official capacity, and | |
| **MICHAEL KELLY**, Director of Pupil Services, in his official capacity, | |
| *Defendants* | |

## I. INTRODUCTION

1.      Plaintiffs Amber Blunt and her parents, Crystal and Michael Blunt (collectively "Blunt Plaintiffs"), file this action to appeal the decision of the Appeals Panel issued pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*. (1997), that failed to address the Lower Merion School District's ("LMSD" or "District") violation of the IDEA's Child Find provision by: a) substituting below grade level substandard and modified classes for the regular curriculum and, b) failing to provide Amber an appropriate education in the least restrictive environment including individualized, specially designed instruction.when she was identified as a student with a disability.

2.      Under the IDEA, students with disabilities are required to receive specially designed instruction, at no cost to their parents, to meet their unique learning needs.  "Specially designed instruction" means instruction whose content, methodology or delivery is designed to address the unique needs that arise from the child's disability and to ensure the child's access to the general curriculum so that the child can meet the educational standards of the public agency.  34 C.F.R. § 300.39(b)(3).  For example, many children with specific learning disabilities require a systematic, structured sequenced program in reading such at Orton-Gillinham or Lindamood-Bell.  With such a program, a student of typical intelligence should be able to read on grade level.

3.      The Blunt Plaintiffs, African Americans, together with five (5)  other African American students with disabilities, their parents, and two local organizations-- the Concerned Black Parents of Mainline, Inc. and the Mainline Branch of the NAACP-- bring this action on their own behalf and on behalf of the class of all similarly situated

African Americans students with disabilities in the LMSD who have been denied an appropriate education in the least restrictive environment without regard to race.

4.    Plaintiffs assert that LMSD routinely misuses so-called below grade level programs and modified classes to remove African American students from the general education curriculum, in some instances to avoid evaluating a student's eligibility for services under the IDEA.   Plaintiffs further assert that LMSD intentionally segregates these African American students in classes that are taught below grade level while depriving them of grade-level subject matter and materials that are provided to their Caucasian peers at all educational levels.

5.    Plaintiffs seek to remedy wide-spread violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution, the IDEA, the Americans with Disabilities Act, ("ADA") 42 U.S.C.§12132 *et seq.*, Section 504 of  the Rehabilitation Act of 1973, 29 U.S.C. §794 Title VI of the Civil Rights Act of 1964 ("Title VI), Section 1983 of the Civil Rights Act of 18971 (ASection 1983"), 42 U.S.C. ' 1983, and Pennsylvania education law which require the Lower Merion School District to:

(a)    Identify and evaluate children at the request of the parents or when the District's staff suspects that the child is a child with a disability.

(b)    Provide each student with specifically designed instruction and related services that are reasonably calculated to confer meaningful educational benefits;

(c)    Educate children with disabilities, to the maximum extent appropriate, with children who do not have disabilities; and

(d)     Not discriminate against students or their parents on the basis of race or disability.

6.      Plaintiffs seek injunctive relief on their own behalf and on behalf of the class to ensure that the District provides the services required under the IDEA to all African American students with disabilities so that they can become literate, valuable, and contributing members of their classroom communities and, ultimately, the community at large.

7.      Plaintiffs seek compensatory damages each on their own behalf to offset the deprivations of an appropriate education to which they are entitled.

## II.  JURISDICTION AND VENUE

8.      Plaintiffs' causes of action arise under the IDEA, 20 U.S.C. §§1400 et seq. (1997) the ADA, 42 U.S.C. 12132 et seq., Section 504, 29 U.S.C. §794, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d, Section 1983 of the Civil Rights Act of 1964, 42 U.S.C. §1983, the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution, and the Pennsylvania Constitution.

9.      This Court has subject-matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 331 and 1343, 20 U.S.C. § 1415(i)(3)(A), 29 U.S.C. § 794a, and 42 U.S.C. §§ 2000d, 12188.

10.     This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

11.     The Blunt Plaintiffs have fully exhausted their administrative remedies under the IDEA, 20 U.S.C. § 1415; the other individual Plaintiffs are excused from doing so because such efforts would be futile.

4

12.    Venue in this district is proper under 28 U.S.C. § 1391(b) because all of the Defendants are deemed to reside in the District as a consequence of their duly appointed positions and all of the events or omissions giving rise to Plaintiffs' claims occurred within the District.

### III. PARTIES

13.    **Plaintiff Amber Blunt** is 20 years old and a 2005 graduate of the Lower Merion School District.   The District identified Amber as a student with a specific learning disability.

### A. Amber's Progression through the LMSD

14.    Throughout her education, Amber needed specially designed instruction and without it, struggled as a learner. In kindergarten, the teacher recognized that "Amber ... was a hard worker" who needed to improve her listening skills and recommended that Amber participate in a pull out program.  The program was not individualized to address Amber's unique needs and the curriculum was below her grade level.  This auxiliary service was designed as a group tutorial program.

15.    The District recognized that Amber needed specially designed instruction well before she reached high school, but it ignored her need for an individualized education program and classification as a student with a specific learning disability until Amber was in the tenth grade at Lower Merion high school.  As a result of the School District's conduct, Amber was denied the special education services she needed throughout her thirteen years of enrollment in the Lower Merion School District.

16.    Amber Blunt attended the District's Penn Wynne Elementary School from kindergarten through fifth grade. Because of Amber's performance on the Metropolitan

Achievement Test, her kindergarten teacher recommended that she attend the District's summer reading program at Merion Elementary School, the participants of which were predominately African American.

17.     Despite Amber's participation in the summer program, Amber's first grade teacher recognized that she needed reading support and recommended her for the below grade level classes in which Amber participated throughout elementary school. Amber was pulled out of her regular classrooms to attend these below grade level classes. These classes did not – nor could they – help Amber overcome deficits identified in her evaluations which required accommodations consistent with those provided to students with specific learning disabilities.

18.     Because these below grade level classes replaced one or more courses in the general education curriculum, the academic performance gap between Amber and her peers widened and increasingly foreclosed the possibility that she would catch up academically to her peers or receive the same educational benefits that they received.

19.     During Amber's fourth grade year, Crystal Blunt was convinced that her daughter had learning disabilities and requested additional resources to provide her daughter with specially designed instruction.  The District advised Mrs. Blunt that the this was all that was available to Amber.  Consequently, the family paid for a private reading specialist to provide Amber with individualized reading support from elementary through middle school.

20.     At the end of Amber's fifth grade year, the District recommended that she participate in its reading program called "REACH" in the middle school.  REACH also

6

was a pull-out program which removed Amber and other students from the general education curriculum.

21.     Amber attended Bala Cynwyd Middle School and struggled with both reading and math while she continued to attend the REACH pull-out program.  Students who participated in the District's REACH program, including Amber, were unable to take the language courses that were part of the general education curriculum that their peers received. Although Amber excelled in her below-grade-level REACH classes, she struggled in her regular curriculum courses.

22.     At the end of Amber's sixth grade year, the District evaluated Amber to determine whether she needed supportive services to achieve at her instructional level. The June 23, 1999 Evaluation Report revealed that Amber's reading comprehension was at the fourth grade level, but when provided with specially designed instruction as provided to students with specific learning disabilities, her comprehension level improved to the beginning sixth grade level.  Although the District recognized in the June 23, 1999 Evaluation Report that Amber needed specially designed instruction similar to that provided to students with specific learning disabilities, it continued to assert that Amber did not present as a child with a disability.  In refusing to identify Amber as a student with a specific learning disability, the District concluded that she was "achieving commensurate with her overall level of cognitive ability, in all areas tested."

23.     In 2001, during Amber's eighth grade year, the District administered various tests at Mrs. Blunt's insistence which showed, *inter alia,* that Amber functioned within the average range of cognition; performed significantly better on non-verbal than on verbal reasoning tasks; was within the average range for visual memory, was better

able to process information that she heard and was within the superior range for auditory processing. The significant subtest scatters exhibited by the testing were clear signals to any experienced school psychologist of the presence of a learning disability. Despite these results, the District concluded that Amber was not in need of special education, but recommended a variety of accommodations to compensate for Amber's below-grade-level performance.

24.     Amber moved into the ninth grade at Lower Merion High School without the supports and services that would have been provided to a student with the classification of specific learning disability. Amber's academic struggles continued through the ninth grade and caused her mother to insist on another evaluation. At the end of Amber's ninth grade year, the District evaluated her once again and concluded that Amber had a specific learning disability manifested in underachievement in the area of reading comprehension, including weakness with inferential reasoning.

25.     On June 13, 2002, the District developed an IEP for Amber for the first time, to be implemented in tenth grade. The IEP provided for supplemental intervention in a regular instructional environment, by attending the Instructional Support Lab (ISL) eight times in an eight day cycle. The IEP indicated that Amber was taking Standard/College Preparatory level courses, intended to attend college, and that the guidance counselor would help Amber identify colleges and career interest areas.

26.     The District recognized that Amber needed specially designed instruction consistent with those provided to children with disabilities under the IDEA well before she reached high school, but it   ignored Amber's need for an individualized education program and  classification as a student with a specific learning disability until Amber

was in the tenth grade at Lower Merion High School.  As a result of the School District's conduct, Amber was denied the special education services she needed throughout her thirteen years of enrollment in the Lower Merion School District.

### B.  LMSD's Failure to Provide Amber with Supports and Services in Math

27.    As early as middle school, it was clear that Amber struggled with math. The June 23, 1999 Evaluation Report reflected Amber's weak math test scores and improvements in performance when she received supports similar to those available to students with specific learning disabilities.  The 2001 evaluation during Amber's eighth grade further noted that Amber scored on the low end of the mathematics subtest, and exhibited considerable difficulty on the Numerical Operations subtest.

28.    Recognizing the deficiencies in Amber's math preparation, LMSD assigned Amber to a modified high school math class for ninth grade —"Prep Algebra"— which roughly equates to a middle school math course.  The standard track for Amber's college-bound, non-disabled ninth grade peers was "Introduction to Algebra."  The Prep Algebra math class to which Amber was assigned covered only a portion of the curriculum taught to students taking "Introduction to Algebra."  Amber received no specially-designed instruction in ninth grade. She earned a D in the course, despite the fact that she had taken Pre Algebra, Part I in seventh and Pre Algebra, Part II in eight grade earning a C and A respectively.

29.    Amber's May 17, 2002 reevaluation conducted at the end of ninth grade, at Mrs. Blunt insistence, failed to follow up on Amber's math deficiencies. Consequently, the IEP developed to be implemented in Amber's tenth grade year,

although noting her below-grade level math performance, failed to identify any math goals and objectives for Amber.

30.     In tenth grade, the District placed Amber in Selected Topics Algebra I in which she received a B.  In eleventh grade, the District placed Amber in Numerical Geometry.  Both classes were below grade level, thus forcing Amber to drop the Chemistry class that was a part of the general education curriculum and take the modified Active Chemistry Course.  Although the Active Chemistry teacher felt the course was too easy for Amber, the denial of access to the general math curriculum made it impossible for her to be successful in the regular education Chemistry course.  Amber earned an A in Active Chemistry.

31.     The standard track for Amber's college-bound, non-disabled tenth grade peers was "Algebra I."  The "Selected Topics in Algebra I" math class to which Amber was assigned covered only a portion of the curriculum taught to students taking "Algebra I."

32.     In eleventh grade, the School District placed Amber in another modified math class titled "Numerical Geometry."  The standard track for Amber's college-bound, non-disabled eleventh grade peers was "Geometry."  The "Numerical Geometry" course to which Amber was assigned covered only a portion of the curriculum provided in the regular Geometry class.  Amber's eleventh grade PSSA scores were "below basic" in math.

33.     The District conducted another evaluation of Amber on June 15, 2004, as Amber was exiting eleventh grade.  The June 15, 2004 evaluation referenced Amber's "uneven skill development and significant gaps in math knowledge and concepts."  This

is consistent with the June 2001 evaluation which found that "Amber was also at risk for learning problems in mathematics."

34.    Although the June 2004 reevaluation expressed concerns about Amber's deficiencies in math, the School District failed to provide support services to Amber to address those deficiencies.

35.    In the summer after eleventh grade, Amber attended a class offered by the School District entitled "Problem Solving Mathematics" which was designed for students entering twelfth grade who had attended the modified math courses.    The District encouraged Amber and other students to enroll in the summer program on the pretense that doing so would allow them to transition into standard track mathematics courses in the following academic year.    The District offered the course in an attempt to improve the PSSA scores of students who were one or two years below grade level in Lower Merion's mathematics sequences.    The students who attended the "Problem Solving Mathematics" class and subsequently took the PSSA's still had "below basic" scores when they re-took the math exam.

36.    The percentage of African American students encouraged to take the summer program in "Problem Solving Mathematics" was disproportionately high compared to the percentage of African American students in the Lower Merion School District and disproportionately low compared with the number of Caucasian students who scored below basic on the math portion of the 11th graders who took the Pennsylvania System of School Assessment ("PSSA") (a standards based criterion-referenced assessment used to measure a student's attainment of the academic standards while also

determining the degree to which school programs enable students to attain proficiency of the standards).

37.    For her twelfth grade year, Amber pre-registered for Statistics, which was a course offered to college-bound students at Lower Merion. Because the District failed to provide accommodations that Amber needed in the Statistics class, she transferred into a modified math class titled "Selected Topics in Algebra II."

38.    The standard track for Amber's college-bound, non-disabled twelfth grade peers was "Algebra II."  The "Selected Topics in Algebra II" math class to which Amber was assigned covered only a portion of the curriculum taught to students taking "Algebra II."

39.    The District routinely places African American students in classes which provides a below grade level and modified curriculum.  The percentage of African American students whom the District places in these below grade level modified classes is disproportionately high compared to the percentage of African American students in the LMSD.

40.    The LMSD assigned Amber to classes with a modified math curricula throughout high school and thus failed to provide her with the same college preparation curricula that her similarly situated Caucasian classmates received.   Consequently, Amber was required to take remedial math in college.

## C.  LMSD's Failure to Provide Adequate Transition Services

41.    On January 28, 2004, during Amber's eleventh grade year, the IEP's transition team recognized that Amber planned to pursue a post-secondary education program.  Although the IEP team acknowledged the expectation that Amber would go to

12

college, the team never considered the impact that Amber's math test scores, her struggles with math or her modified math curriculum would have on developing supports and services relating to her transition into college.

42.    Amber's IEP team did not conduct a transition planning meeting until Amber was in twelfth grade.  When the IEP team finally conducted the transition planning meeting, the team acknowledged that Amber was not ready to transition into postsecondary education unless she receives additional supports and services.

43.    Amber was accepted to two colleges – Kutztown University and West Chester University – on the condition that she attend pre-college programs. Amber was admitted to Virginia State University without conditions but was not accepted to her first choice school – Temple University.  Kutztown University advised Amber that she could only enroll for the Fall of 2005 if she successfully completed its "Summer Start" program.  West Chester University advised Amber that she could enroll on the condition that she would attend a six-week program in the areas of reading, writing, speaking, math and critical thinking.

44.    Although the School District was aware that approximately half of West Chester University's incoming freshmen take the summer course, this information was neither shared with Amber and her parents nor incorporated into a transition plan.

45.    **Plaintiffs Crystal and Michael Blunt** are Amber's parents.  At all relevant times, the family resided in the LMSD and sought to obtain for their daughter an appropriate education consistent with the IDEA.  The parents supplemented Amber's academic program and the District's sub-standard education with reading support

services from elementary through middle school and continue to supplement Amber's college education by paying for additional tutorial supports.

46.    **Plaintiff Lydia Johnson** is a 19 year old African American who was enrolled in the District from the time she was in Kindergarten through her twelfth and thirteenth year of school.  The District identified Lydia as a student with a disability in elementary school and placed her in special education classes.  Although Lydia was eligible to graduate in June of 2006, she returned to LMSD for support services in an effort to rectify serious deficiencies in her education.

47.    The District first evaluated Lydia in January 1995, when Lydia was in first grade.  The January 1995 evaluation identified Lydia as a student with a learning disability which impacted upon her visual spatial orientation and perceptual motor skills.  The District referred Lydia for an Occupational Therapy evaluation and recommended that Lydia receive Occupational Therapy supports.  Thereafter, the District determined that the Occupational Therapy goals were met and those support services were discontinued.

48.    As Lydia continued to struggle with reading, the District determined that Lydia's needs exceeded the resources available in regular education and that she should receive intensive learning support services.

49.    The District reevaluated Lydia when she was in sixth grade, as detailed in a report dated June 7, 2000.  The June 7, 2000 evaluation recognized that Lydia's "reading skills [were] significantly below grade level both in terms of decoding and comprehension, her "math skills [were] approximately [third to fourth] grade level,"  her "attention may wander especially if frustrated or overwhelmed," and  her "visual spatial

14

and part/whole thinking [was] extremely weak." The testing performed during the course of the 2000 evaluation revealed that "Lydia's academic skills are significantly below her grade level placement" but "nonetheless . . . [were] within the range predicted by her cognitive skills."

50.    According to the June 7, 2000 evaluation, Lydia's "significant visual perceptual weaknesses have impacted upon her reading and math skills and continue to suggest a diffuse learning disability." The evaluation concluded that "Lydia continues to present a moderate degree of need" and that "although her skills are consistently with current cognitive levels, the inconsistency of her performance and her long-standing difficulties with visual perceptual tasks suggest cognitive scores may be underestimates of her true abilities." In addition, the evaluation noted that "Lydia's skills are consistently below grade level and require accommodations be made in order for her to meet with academic success."

51.    The June 7, 2000 evaluation stated that "as initially indicated in first grade, Lydia's learning disability is visually based and manifests itself in many areas, including reading, writing, math and spatial relations."

52.    The IEP which the District provided Lydia failed to provide specialized instruction to address Lydia's particular needs and failed to provide for Lydia to receive the supports and services she needed to access the general education curriculum and to receive an appropriate education in the least restrictive environment.

53.    The District prepared a comprehensive reevaluation report on January 21, 2004, when Lydia was in tenth grade, when the District classified Lydia's disability, for the first time, as "educably mentally retarded." The evaluation further reflects that Lydia

was at the third grade level in word reading and math reasoning and at the 2.8 grade level in spelling.

54.     Lydia's February 17, 2004 IEP states that "to meet success, Lydia requires a small group setting with some individualized instruction particularly when any reading is required."  Despite the District's acknowledgment that Lydia required individualized instruction, particularly with reading, the District failed to provide Lydia with such specialized instruction or the services of a reading specialist.  Throughout her five years at Lower Merion High School, Lydia was unable to read or write at a level that would allow her to transition into independent living.  Nevertheless, her report cards reflect mostly A's and B's, and indicate that she was on Honor Roll.

55.     In a reevaluation report dated January 20, 2006, when Lydia was in twelfth grade, the District determined that Lydia's word recognition was at a 5.8 grade level and her reading comprehension was at a 5.2 grade level which indicated that Lydia had increased her reading comprehension by approximately two grade levels above her 2004 performance level.

56.     Although Lydia needed additional academic growth and development to live and work independently, the District advised her that she had met all the requirements to graduate in June of 2006 in an attempt to deprive her of much needed services.

57.     In 2006, Lydia's mother, Linda Johnson, told the District that she did not feel that her daughter was prepared to graduate because of her severe reading deficiencies.  At her mother's insistence, Lydia walked in the graduation ceremony with her contemporaries but declined her diploma.

58.    For the year 2006-2007, Lydia attended Lower Merion High School two mornings a week, during which she was placed back in the same classroom, with the same teacher, she had the previous year. The District failed to provide Lydia with a reading specialist to address her individualized needs.

59.    **Plaintiff Linda Johnson** is Lydia's mother.  At all relevant times, the family resided in the LMSD.  Because of a physical disability, Ms. Johnson has been unable to apply the constant and consistent pressure that is required to ensure that the District provides Lydia with an appropriate education.

60.    **Plaintiff Saleema Hall** is a 13-year-old African American seventh grader who attends the District's Welsh Valley Middle School.  She has attended the District's Penn Valley Elementary School from kindergarten through fifth grade.  In fifth grade, Saleema was evaluated by the district and determined eligible for services under the IDEA with a classification of "Speech or Language Impairment." Seleema continues to receives services under the IDEA

61.    The District evaluated Saleema and prepared a report dated September 30, 2004, which reflected that Saleema was in a regular education program with pull out participation in a below grade level class that was about 90% African American despite the fact that LMSD has a 7.5% African American student population.

62.    Saleema's evaluation indicated that she had a "specific learning disability in reading and some relative weaknesses in language processing, word retrieval, word recognition, understanding directions, and semantic memory."  At the time of the September 30, 2004 evaluation, Saleema was in the general education classroom and received learning support.

17

63.    The only testing that was indicated on the September 30, 2004 evaluation report was: the Expressive Vocabulary Test and the CLEF-3 Clinical Evaluation of Language Fundamentals.  The "Evaluations and Information Provided by the Parents of the Child" section of the evaluation contained only the sentence that "Ms. Stuart is supportive of this evaluation and appropriate follow up."

64.    Throughout her education in the LMSD, Saleema has been pulled out of the general education curriculum, placed in a program that is below her grade level and denied access to the general education curriculum that is the same academic program as provided her Caucasian non-classified peers.

65.    **Plaintiff Carol Durrell** is the mother of Saleema.  At all relevant times, the family resided in the LMSD.  Ms. Durrell has relied on the District to provide her daughters with an appropriate education consistent with federal and state mandates.

66.    **Plaintiff Walter Whiteman ("Jonathan")** is a 15-year-old African American ninth grader who attends Lower Merion High School.  Jonathan was identified as a student in need of special education services when he was in first grade due to deficits in reading and writing skills.  Because he tested within the average intelligence range his classification was specific learning disability.

67.    Jonathan also was pulled out from the general education curriculum to participate in classes with a below grade level curriculum and which denied him access to the general education classes as was provided to his Caucasian peers.

68.    Although Jonathan's most recent evaluation report, dated November 22, 2006, indicates a recurrent history of aggressive behavior toward other children, "low frustration tolerance and inability to inhibit aggressive responses" which have

compromised his progress in learning, the LMSD did not indicate on his IEP that he has behaviors that impede his learning or the learning of others. The Assistant Principal of Lower Merion High School reported that Jonathan does not always seem to understand the consequences of his actions.

69.    The District has not implemented an effective behavior support plan to enable Jonathan to benefit from participating in the general education curriculum, rather, Jonathan has been suspended for behaviors relating to his disability with no plan to implement positive behavior approaches to reduce the number of suspensions.

70.    **Plaintiff Christine Dudley** is Jonathan's mother. Mrs. Dudley has repeatedly requested assistance from the LMSD to address Jonathan's emotional and behavioral needs since he was in elementary school, all of which went inexplicably unanswered. She has visited the school on many occasions and is terrified that her younger son will be victimized by the same lack of services as Jonathan.

71.    **Plaintiff Eric Allston** ("Eric") is a 19-year-old African American who was a student in the District from sixth grade until he graduated in May 2006. As Eric was required to repeat the sixth grade, he attended school in the District for a total of eight years. The District identified Eric as a student with a disability in middle school and placed him in special education classes.

72.    The District first evaluated Eric when he was in sixth grade. In November 1998, in his first year of sixth grade, Eric was found to have word recognition at a sixth grade level with excellent oral reading. Due to his difficulty focusing during the evaluation, however, Eric's reading comprehension was at a second grade level. In

March 1999, LMDS conducted another evaluation of Eric, which identified Eric as having combined inattention and hyperactive-impulsive ADHD.

73.    The District found that Eric needed a highly structured, closely supervised, emotionally supportive learning environment.  Although the District noted that Eric was able to complete tasks when given one-to-one support, the District held that even with supports, Eric would not be able to function in regular education classes.  The District recommended Eric for learning support and emotional support services.

74.    Despite recognition of Eric's learning disability, in June 2000, the District denied Eric promotion to the seventh grade and held him back to repeat sixth grade for the 1999-2000 school year.  During this period, Eric participated in an itinerant emotional support program, meeting with the emotional support teacher only twice a week.  Additionally, Eric received emotional support services in cooperatively taught math and language arts classes, and a daily lab period.  Eric's only regular class was science, which had a special education staff person in the classroom.  The district noted that Eric had shown an improvement in behavior with the emotional support.

75.    LMDS reevaluated Eric in May 2000.  His scores were erratic, suggesting a higher cognitive potential than previously demonstrated.  His scores in verbal mediation were in the 80th percentile and higher, while math was in the 18th percentile.  His "Freedom From Distractibility" score was in the 25th percentile.

76.    For both years of sixth grade, from 1998 to 2000, Eric participated in REACH, a pullout-reading program.  REACH is not an emotional support program.  Eric was frustrated in the REACH program, finding the textbooks and course work were

significantly below his reading level.  Despite the fact that LMSD has a 7.5% African American student population, Eric's REACH classes were all African American.

77.    In summer of 2000, the District recommended Eric for part-time education class in alternate regular school, with a classification as emotional support.  Eric was transferred to the Welsh Valley Middle School for seventh grade and assigned to the PRIDE program.  According to the District, "Project P.R.I.D.E. is the district's emotional support program at the secondary level.  All students are identified as having disabilities in the emotional realm."  Fifty percent of the six students in these classes were African American.   In the LMSD, Caucasian students are some 79% of all those with an emotional disturbed label.  African Americans with the emotional disturbed label are only 16% of that population, thus their representation in the PRIDE classes are disproportionate to their numbers in the population of all students with that classification.

78.    Eric attended the PRIDE program daily through eighth grade, some days having five sessions and was in the regular classes for art and gym.  He attended a sixth grade language arts class.  The rest of the classes were all in the same classroom, segregated from the other students.  During this period, Eric expressed his frustration with the substandard level of work and requested more challenging opportunities. Because of the stigma related to the PRIDE program, Eric felt ostracized from the regular students.

79.    At the end of eighth grade, Eric and his guardian, Aginah Carter-Shabazz, who is also his grandmother, requested that Eric attended Lower Merion High School beginning in ninth grade. They also asked for a reevaluation.  Without conducting the reevaluation, the District told Eric that he could not be accommodated at LMHS.  Instead,

Eric was sent to Harriton High School, where he participated in its PRIDE program for high school students where the racial composition of the class continued to be predominately African American. During ninth and tenth grades, Eric attended only one subject class in the regular classroom.

80.    At the end of tenth grade, in April 2004, Ms. Carter-Shabazz again requested a reevaluation and a transfer to LMHS. The District responded that Eric was not eligible to attend LMHS because of his disability classification, but that he might be able to attend LMHS if he met his goals in the PRIDE program.

81.    Eric began his eleventh grade year in Harriton High School; however, he was placed in a twelfth grade general education English class based on his tenth grade performance in this one class that he had in the regular education curriculum. He greatly enjoyed the class because it was both interesting and challenging. At the same time, the LMSD sent Eric to Vocational Technical (Votech) classes in the morning, making these Votech classes a graduation requirement despite Eric's stated goal to attend college after graduation.

82.    In November 2004, against Eric's wishes, the District transferred Eric to Lincoln High School. Lincoln Academy is a private school located in Bridgeport, PA. It is a segregated school for children with disabilities who are removed from regular public schools. The student body consists of approximately 64 students ranging from grades 4 through 12. Students are typically removed from regular schools and referred to Lincoln Academy on the basis of their disability. Eric agreed to attend Lincoln because this was the only option that the District offered that would enable him to participate in the

graduation ceremonies with the rest of his class. Alternatively, the District suggested that Eric remain at Harriton with accelerated graduation a year ahead of his classmates.

83. While at Lincoln, Eric attended Votech in the afternoon with limited classes at Lincoln in morning. Eric continued this program through twelfth grade.

84. In September 2005, Eric's IEP noted that Eric wanted to attend college. Nonetheless, his transition plan only suggested that Eric meet with his guidance counselor to explore career options and review NCAA guidelines that he could never meet since half of his school day was spent in VocTech classes which would not satisfy the NCAA's core course requirement and in spite of the fact that Eric no longer participated in LMSD's basketball program. The District did not provide Eric with any additional support or services in the less than adequate transition plan that it provided.

85. Eric graduated from the LMSD in June 2006. When he requested his transcript, the District calculated his GPA at 1.48.

86. Due to this low GPA, Eric was denied acceptance at his two preferred colleges, Cheyney University and the Philadelphia Art Institute. Eric tested out of the remedial classes at Community College. Unable to continue in his preferred area of digital imaging, Eric currently is not enrolled in college but works in retail instead.

87. Despite the fact that LMSD has a 7.5% African American student population, Eric's classes have all been predominantly African American.

88. **Plaintiff Concerned Black Parents of the Mainline, Inc. ("CBP")**, is a non-profit Pennsylvania corporation whose purpose is, *inter alia*, to promote equity and excellence in the response of school districts to the needs of diverse student populations; to address issues related to education for populations identified as minority and/or

African American; and to identify, monitor, and inform parents about educational issues impacting disadvantaged students, their families and the community at large. CBP brings this action on its behalf and on behalf of its members.

89. **CBP** has been operating as an organization in the LMSD for about 13 years. It conducts its business through P.O. Box 246, Ardmore, PA 19003. The members of the organization are residents of the Lower Merion School District and current and former parents or students of the District.

90. **Mainline Branch of the National Association for the Advancement of Colored People, Inc. ("NAACP")** is a non-profit organization whose purpose is, *inter alia*, to oppose racial injustice and insure educational equality of African American students who receive their education from the Lower Merion School District. The Mainline Branch brings this action on its own behalf and on behalf of its members.

91. The Mainline Branch of the NAACP is one of the Pennsylvania State NAACP chapters. The NAACP which was formed in 1909 by a multiracial group of progressive thinkers, is a non-profit organization established with the objective of insuring the political, educational, social and economic equality of minority groups. The mission of the national organization and all of its chapters is to eliminate racial prejudice and remove all barriers of racial discrimination through the democratic processes. The Regional Offices actualize these goals in their respective areas. The Mainline Branch of the NAACP was chartered for the purpose of carrying out the mission of the NAACP which is "to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination." Through various committees, the Branch works toward this effort by reaching out to the community in providing

24

information, receiving complaints and partnering with the various entities to proactively eliminate discriminatory practices.

92.    Historically, the Mainline Branch has received numerous complaints from parents for actions relating to the treatment of African American children in the LMSD. Among these complaints is one concerning the disproportionate number of African-American students placed in modified classes and in segregated special education courses that deny them access to the general education curriculum and to the Pennsylvania Department of Education standards.  The Branch has served as an advocate for parents, held educational forums to provide important information regarding how to navigate the system, and assisted parents to assure that their children receive academic work consistent with their grade level.  The Branch has consistently worked with parent groups, such as the Concerned Black Parents Group, to gather information concerning the educational gap that exists for African-American students in the LMSD.

93.    **Defendant Lower Merion School District ( "LSMD" or the "District")** is the local educational agency charged with the responsibility to provide for the education of children with disabilities in the township of Lower Merion as required under 20 U.S.C. § 1413.  Its administrative offices are located at 301 East Montgomery Avenue in Ardmore, PA  19003-3399.

94.    There are ten schools in Lower Merion: six (6) elementary schools: Belmont Hills Elementary, Cynwyd Elementary, Gladwyne Elementary, Merion Elementary, Penn Valley Elementary and Penn Wynne Elementary; two (2) middle schools: Bala Cynwyd Middle School and Welsh Valley Middle School; and two (2) high schools: Lower Merion High School and Harriton High School.

25

95.    The District receives federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act.

96.    As a Local Educational Agency ("LEA") within the meaning of the IDEA, the Lower Merion School District is responsible for providing children with disabilities an appropriate education in the least restrictive environment and for effectuating policies, procedures, and programs that are consistent with the State policies and procedures established under the Act.  20 U.S.C. § 1413.

97.    **Defendant Jamie Savedoff** is the Superintendent of the District with his office at 301 East Montgomery Avenue in Ardmore, PA  19003-3399.  He is responsible for the administration of all educational programs provided by the District, including the programs for all special education students and the modified, pull-out curriculum provided to African American students.  Defendant Savedoff has overall administrative responsibility to ensure that African American children in the LMSD are neither discriminated against nor provided with an education that is inferior to that provided to other children in the District solely by operation of their race.

98.    **Defendant Michael Kelly** is the Director of Pupil Services with his office at 301 East Montgomery Avenue in Ardmore, PA 19003-3399.  He is responsible for the administration of the District's special education program and for ensuring that the evaluation, identification and programming for all eligible students are done consistent with the mandate under the IDEA.  In addition, Dr. Kelly is responsible for ensuring that the supports and services that students eligible for services under the IDEA and 20 Pennsylvania Code Chapter 14 are provided.

26

## IV.  CLASS ACTION ALLEGATIONS

99.    Each of the Plaintiff students is an African American eligible for services under the IDEA.  At all relevant periods, each was a resident of the LMSD, enrolled in or graduated from the District.  Each has been denied a free appropriate public education, as guaranteed by the IDEA, and each has been segregated into separate and unequal educational programs.  Plaintiffs bring this action on their own behalf as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of all African American students in the Lower Merion School District who have been denied access to the general education curriculum and the specially designed instruction to meet their unique learning needs and provided an educational program separate and inferior to that provided their Caucasian classmates.

100.    The class consists of all present and future African American students in the LMSD who, because of Defendants' acts and omissions violating the requirements of the United States Constitution and federal and state laws: are denied access to the general education curriculum; are placed in below grade level classes; receive a modified curriculum; and/or are sent to separate, segregated schools which provides them with an education inferior to that provided their Caucasian peers.

101.    The class is so numerous that joinder of all class members is impracticable.  The number of class members is not fully known to Plaintiffs at present, although it can be ascertained by Defendants.

102.    The members of the class have all been denied rights under federal law, including under the IDEA, the ADA, Section 504 of the Rehabilitation Act, Title VI, Section 1983, the Fourteenth Amendment of the United States Constitution, and

27

Pennsylvania Special Education law as a result of the actions, inactions, policies, and practices of Defendants and their systematic failure to carry out their duty to provide students with an appropriate public education.

103.    Plaintiffs seek declaratory and injunctive relief to eliminate Defendant's unlawful actions, policies and practices and to require Defendants to establish standards and procedures that do not arbitrarily deny to Plaintiffs and the class their rights guaranteed by federal and state laws, rules and regulations.

104.    The named Plaintiffs will adequately and fairly represent the interests of the class.

105.    Substantial questions of law and fact are common to the entire class. Those questions include:

(a)    Have Defendants discriminated against Plaintiffs and the class on the basis of their race, by routinely placing them in below grade level and/or modified classes?

(b)    Have Defendants discriminated against Plaintiffs and the class by failing to identify and evaluate their need for special education services in a timely manner?

(c)    Have Defendants failed to ensure that Plaintiffs and the class receive access to the general education and are properly prepared to be competitive academically as are their Caucasian peers?

(d)    Have Defendants discriminated against Plaintiffs and the class by failing to provide them with specially designed instruction to meet their unique learning

needs and failing to provide them with the supports and services they need to be included in the least restrictive environment?

(e)    Have Defendants' policies and practices resulted in the inappropriate placement of African American students with disabilities in below grade level and/or modified classes rather than providing them the specially designed instruction, at no cost to their parents, to meet their unique learning needs?

(f)    Have Defendants' policies and practices resulted in the denial of services in the least restrictive environment to African American students with disabilities?

106.    The claims of the individual Plaintiffs are typical of the class.

107.    The named Plaintiffs and their counsel will adequately and fairly represent the interests of the class.

108.    A class action is superior to any other available method for the fair and efficient adjudication of the controversy.

109.    Defendants have acted on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

## V.  FACTS

### a.  *LMSD's Policies and Practices in Educating African Americans*

110.    Approximately 6,800 students are enrolled in the Lower Merion School District, of whom approximately 7.5% are African American.

111.    In routinely assigning African American students to classes with below grade level courses and a modified curriculum, LMSD allows students to graduate with a

deficient education that hampers their successful transition into independent adult lives or post-secondary education.

112.    The District's Report Card of its annual yearly progress ("AYP") data for reading achievement show that the number of African Americans who score below basic (the lowest level on the state-wide assessment) increases as children get older and is a substantial proportion then Caucasian children.  While 13% of these students tested in the fifth grade scored below basic, 24% tested below basic in eighth grade and 36% tested below basic in eleventh grade.  In contrast, 3% of fifth-grade Caucasian students tested below basic; 5% of eighth grade Caucasian students tested below basic and 6% of eleventh grade Caucasian students tested below basic.  Demonstrating that an education in the LMSD is detrimental to the academic development and post-graduation opportunities of its African American students

113.    The District routinely congregates African American students with disabilities into a single classroom and fails to provide each student with the individual education program that would meet each ones' needs.  The separate classes where Plaintiffs and class members find themselves are 90 - 100% African American; in a District with a 7.5% African American population such grouping can only be attributed to the intentional segregation of these students.

114.    The District does not adequately ensure that its personnel is prepared to: educate students with disabilities in regular classes; provide them with specially designed instruction, at no cost to their parents, to meet their unique learning needs; and, provide them with access to the general education curriculum.

115.    After placing students with various disabilities into a single classroom, Lower Merion School District merely advances the students, year by year, towards graduation without regard to the lack of progress made on their IEP goals or advancement in the general education curriculum.  As a result, students can earn A's and B's in their segregated classrooms and graduate without being able to read or perform basic mathematical functions.

116.    Although Lower Merion School District prides itself on the "blue ribbon education" it offers to some students, it routinely does so at the expense of Plaintiffs and class members who are left far behind.

### b. *__Blunt Due Process Proceeding__*

117.    On April 8, 2005, the District rejected Plaintiff Crystal Blunt's request for transitional services in the form of a six-week remedial program required by West Chester University as a condition of Amber's admission to the school in lieu of the transition services that the District should have developed and implemented for her daughter.

118.    On April 11, 2005, Amber's parents requested a due process hearing, seeking relief from the School District's failure to comply with the IDEA, by failing to provide Amber with a free appropriate public education.  The hearing began on May 19, 2005, at which time the Hearing Officer advised the parties that the Hearing would be limited to one session and advised both counsel to conduct their cases accordingly. The District began with its case-in-chief.  At 6:00 p.m., the School District had not completed its presentation; however, the Hearing Officer concluded the hearing and scheduled a second session, which he stated would be the final session.

119.    At the second session, on June 20, 2005, the District continued its case-in-chief.  After the lunch break, the Parents put on their presentation.  Before the direct examination of Mrs. Blunt was complete, the Hearing Officer gave Parents' counsel ten minutes to conclude.  The Hearing Officer allowed the District 25 minutes for Mrs. Blunt's cross-examination, as well as the opportunity to present a rebuttal witness, an option not provided the parents.

120.    The IDEA provides that when parents are involved in a complaint under the Act, they "shall have an opportunity for an impartial due process hearing."  20 U.S.C. § 1415(f)(1)(a).

121.    The procedural safeguards of the IDEA provide that any party to a hearing has "the right to present evidence."  20 U.S.C. §1415(h)(2).

122.    Chapter 19 of the Pennsylvania Hearing Officer's Handbook identifies the responsibilities as "hearing testimony, receiving documentary evidence, and guiding the hearing process so as to conform to applicable state and federal laws and regulations."

123.    The Hearing Officer failed to provide Plaintiffs with a full and fair opportunity to address the appropriateness of the transition services that the District provided Amber to ensure her success at the post-secondary level.

124.    The Hearing Officer did not hear any testimony concerning Amber's abilities, deficits and skills.

125.    The Hearing Officer did not hear testimony regarding any skills, services or supports that Amber would need at the post-secondary level.

126.    The actions of the Hearing Officer were inconsistent with the tenets of the IDEA's due process safeguards.

32

127.    The Hearing Officer noted in his Decision that: "the record does not contain information upon which I can determine that 44 hours of compensatory education is the rough cost equivalency of the relief requested by the student, i.e, reimbursement of the West Chester University six week summer program and an updated evaluation."

128.    The Hearing Officer's refusal to hear testimony about the supports and services that Amber would require to ensure her successful transition to West Chester University, the post-secondary institution that the District knew or should have known that Amber would be attending, impacted his ability to determine the appropriate amount of relief to grant.

129.    The Hearing Officer denied the relief for transition services based on the absence of information that would have been provided had the Hearing Officer not truncated the Parent's presentation.

130.    The Hearing Officer failed to comport with the IDEA's due process safeguards.

### c. *Hearing Officer's Decision*

131.    On July 25, 2005, the Hearing Officer determined that the School District failed to provide Amber with an appropriate IEP transition plan and further found that Amber was not entitled to any relief prior to one year before the Parent's Request for due process.  Although the Hearing Office acknowledged the District's failure to develop an appropriate transition plan, he denied Amber any relief for this failure.

132.    The Hearing Officer noted that although Amber's pre-high school evaluation recommended monitoring of her math progress, the School District failed to identify and address Amber's math-related needs. The Hearing Officer concluded that the

District's failure to identify and program for Amber's math related needs constituted a denial of FAPE, but limited the relief to which she was entitled to only 44 weeks of compensatory education for the period from April 11, 2004 through the date of her graduation in June 2005.

133.    The Hearing Officer failed to consider any of the claims concerning the District's failure to identify and evaluate Amber by limiting the review period to one year.

### d.  *Decision of Appeals Panel*

134.    Both the Blunt Plaintiffs and the School District filed exceptions to the Hearing Officer's Decision. In its August 31, 2005 decision, the Appeals Panel determined that the District did not fulfill the applicable transition requirements to which Amber was entitled and modified the Hearing Officer's Order by determining that "the District shall promptly provide the Student with 30 hours of compensatory education for remedial transition services."

135.    The Appeals Panel upheld the Hearing Officer's determination that Amber's entitlement to compensatory education was limited to one year before the request for a due process hearing was filed, relying on *Montour School District v. S.T.,* 805 A.2d 29 (Pa.Commw. Ct. 2002) despite the fact that federal courts in Pennsylvania have consistently rejected the limitations period set forth in the Commonwealth Court's *Montour* decision.

136.    Amber's claim for compensatory education covers the entire time that she was denied a free, appropriate public education because the District failed to identify her as a student with disabilities.

34

# VI.  LEGAL CLAIMS

## *Count One:  Individuals with Disabilities Act*

137.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

138.    The IDEA requires state public schools that receive federal money to provide a free and appropriate public education ("FAPE") to all students with disabilities based on the unique needs of the student. 20 U.S.C. § 1412(a)(1).

139.    To ensure that public schools provide a FAPE to all eligible students, the IDEA requires that the school districts locate all children within their jurisdiction who are eligible for special education services, through "Child Find" activities.

140.    The Child Find obligation under the IDEA requires state and local agencies to ensure that:

> All children with disabilities residing in the state … who are in need of special education and related services, are identified, located and evaluated, and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services. 20 U.S.C. §1412(a)(3);  34 C.F.R. § 300.125.

141.    The Pennsylvania special education regulations similarly require that school districts have an obligation to identify children suspected of having a disability and conduct a process to screen children for referral to special education. 22 Pa. Code §§ 14.121, 14.122.

142.    Upon referral, the student must receive a complete evaluation to determine whether he or she is a "child with a disability" in need of specially designed instruction. 34 C.F.R. § 300.309(c)(2);  22 Pa. Code § 14.122.

35

143.   Once a child is identified as eligible for special education services, the District must develop an Individual Education Program ("IEP") tailored to address the child's educational needs.  20 U.S.C. § 1414(d).

144.   The IEP must provide for "significant learning" and confer a "meaningful educational benefit" on the child to satisfy the requirements of a FAPE.

145.   For children with disabilities who are sixteen years of age or older, the IDEA obligates schools to provide transition services that promote a bridge between school programs and adult life, including, where appropriate, transition to post-secondary education.

146.   Plaintiffs Amber Blunt, Lydia Johnson, Saleema Hall, Walter Whiteman Eric Allston and class members are disabled students within the meaning of the IDEA.

147.   The Defendants have violated the rights of Plaintiffs and the class as secured by the IDEA, and 34 C.F.R. Part 300 by:

(a)   Denying Plaintiffs and the class a free, appropriate public education and an opportunity to receive a meaningful benefit from education, as defined by 20 U.S.C. § 1401(9), in violation of 20 U.S.C. § 1412(a)(1)(A).

(b)   Failing to provide Plaintiffs and the class the special education and related services necessary for them to make reasonable progress in the general curriculum, as required by 20 U.S.C. §§ 1414(c)(1)(B)(iv), 1414(d)(1)(A).

(c)   Failing to identify, locate and evaluate children with disabilities and provide needed special education and related services, in violation of 20 U.S.C. §1412(a)(3), 34 C.F.R. §§ 300.125,  300.111.

(d)     Failing to provide a complete evaluation to determine whether Plaintiffs and members of the class are "children with a disability" in need of specially designed instruction, in violation of 20 U.S.C. §§ 1414(a)(1)(B) and 34 C.F.R. § 300.320..

(e)     Failing to provide transition services to promote the movement of disabled students from high school to post-secondary education and other adult activities.

(f)     Failing to implement substantial or significant provisions of the IEPs that were provided to class members such that the disabled children were denied a meaningful educational benefit.

### _Count Two: Title II of the Americans With Disabilities Act_

148.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

149.    Title II of the ADA prohibits public entities from discriminating against individuals with disabilities.  It states that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

150.    Defendants have violated the rights of Plaintiffs secured by the ADA,  seq. and 28 C.F.R. § 35.130, by:

(a)     Failing to provide Plaintiffs and the class an opportunity to participate in and benefit from education that is equal to the opportunity afforded students without disabilities, in violation of 28 C.F.R. § 35.130(b)(ii).

(b)     Failing to provide Plaintiffs and the class with educational and other services that are as effective in affording equal opportunity as the services provided to students without disabilities, in violation of 28 C.F.R. § 35.130(b)(iii).

(c)     Limiting the enjoyment by Plaintiffs and the class of the right and opportunity to receive a public education, in violation of 28 C.F.R. § 35.130(b)(1)(vii).

### *Count Three: Section 504 of the Rehabilitation Act*

151.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

152.    Section 504 prohibits disability discrimination in federally funded programs.  The pertinent text of Section 504 is as follows:

> No otherwise disabled qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...

153.    Class representatives Amber Blunt, Lydia Johnson, Saleema Hall, Walter Whiteman and Eric Allston and members of the class are "disabled" students who were otherwise qualified to participate in school activities.

154.    Defendant Lower Merion School District receives receive federal financial assistance.

155.    Defendants have violated the rights of Plaintiffs secured by Section 504 4 and 34 C.F.R. § 104.4, by:

(a)     Denying Plaintiffs and the class the opportunity to participate in and benefit from federally-assisted regular education services, programs, and activities,

including special education and related services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a), (b)(I).

(b)    Failing to provide Plaintiffs an opportunity to participate in and benefit from regular education and other services that is equal to the opportunity afforded students without disabilities, in violation of 34 C.F.R. § 104.4(b)(ii).

(c)    Failing to provide Plaintiffs and the class with educational and other services that are as effective in providing equal opportunity as the services provided to students without disabilities, in violation of 34 C.F.R. § 104.4(b)(1)(iii) and (b)(2).

(d)    Limiting the enjoyment by Plaintiffs and the class of the right and opportunity to receive a public education in the least restrictive environment, in violation of 34 C.F.R. § 104.4(b)(1)(vii).

### *Count Four: Title VI of the Civil Rights Act*

156.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

157.    Title VI of the Civil Rights Act of 1964 prohibits discrimination in federally funded programs on the basis of race, color, or national origin. 42 U.S.C. § 2000d.

158.    Defendant Lower Merion School District receives federal financial assistance.

159.    Plaintiffs Amber Blunt, Lydia Johnson, Saleema Hall, Walter Whiteman, Eric Allston as well as all class members are intended beneficiaries of the federal funds provided to the Lower Merion School District.

160.    LMSD makes decisions concerning educational placements and services that it provides on the basis of racial prejudice and stereotypes and such decisions have operated to deprive Plaintiffs and members of the class the educational benefits to which they are entitled and which they require to become productive citizens.

161.    Although the IDEA requires LMSD to identify students with disabilities, evaluate them at the request of the parents or when the District has cause to believe that an evaluation is warranted, and provide them an appropriate education in the least restrictive environment, LMSD systematically discriminates against African American students by placing them in separate below grade level classes, other modified education classes and/or separate schools while failing to provide them with an IEP and the supports and services they require to receive their education in the general education classroom with their Caucasian peers.

162.    Plaintiffs also seek a remedy for Defendants' denial of their rights under Title VI of the Civil Rights Act of 1964 and the United States Constitution for themselves and all other students who are similarly situated, who were denied the educational benefits mandated under the IDEA because of their race.

163.    Defendants have discriminated intentionally against Plaintiffs and the class and  violated Title VI by:

(a)    Denying Plaintiffs and the class the benefits of education in regular classes or access to the general education curriculum, in violation of 42 U.S.C. 2000d and 34 C.F.R. 100.3(a) (i);

(b)     Providing Plaintiffs and the class educational services that are different from those provided to their Caucasian peers, in violation of  42 U.S.C. 2000d and 34 C.F.R. 100.3(a)(ii);

(c)     Subjecting Plaintiffs and the class to segregation or separate treatment in the receipt of services and educational benefits that the School District provides to their Caucasian peers, in violation of  42 U.S.C. 2000d and 34 C.F.R. 100.3(a)(iii);

(d)     Restricting Plaintiffs and the class in the enjoyment of the advantages and privileges provided to their Caucasian peers, in violation of  42 U.S.C. 2000d and 34 C.F.R. 100.3(a)(iv); and

(e)     Treating Plaintiffs and the class differently from others in determining whether they satisfy any admission, enrollment, quota, eligibility, membership or other requirement or condition which their Caucasian peers meet to be receive the benefits of the educational programs in the Lower Merion School District, in violation of  42 U.S.C. 2000d and 34 C.F.R. 100.3(a)(v).

### *Count Five: Section 1983*

164.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

165.    Section 1983 of the Civil Rights Act of 1964 ("Section 1983"), 42 U.S.C. §1983, forbids state officials from depriving individuals of rights secured by the United States Constitution.

166.    Lower Merion School District's custom and practice is to deny African American students the full range of educational services available to students under the IDEA

167.    Defendant Jamie Savedoff, acting with the necessary policy-making authority and with deliberate indifference to the rights of African American Students has allowed the Lower Merion School District to apply policies, practices or customs which have deprived African American students and their parents of their rights to equal protection of the laws as well as their statutory rights under the ADA and the Rehabilitation Act.

168.    Defendants have violated the rights of Plaintiffs and the class secured by 42 U.S.C. Section 1983 by acting under color of law, intentionally, willfully and with deliberate indifference, to deprive them of rights and privileges secured and protected by the Constitution and laws of the United States.

### *Count Six:  Pennsylvania Education Law*

169.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

170.    Defendants have violated the rights of Plaintiffs and the class secured by 20 Pa. Code Chapter 14 by:

(a)    Failing to identify children suspected of having a disability and conduct a process to screen them for referral to special education, in violation of 22 Pa. Code § 14.121(b) and (c); and

(b)    Failing to provide a complete evaluation to determine whether Plaintiffs and members of the class are "children with a disability" in need of specially designed instruction, in violation of 22 Pa. Code § 14.122.

## VII.  RELIEF REQUESTED

**WHEREFORE**, Plaintiffs pray this Court for an **ORDER**:

(1)    **CERTIFYING** the Class as set forth herein, with Amber Blunt, Lydia Johnson, Saleema Hall, and Walter Whiteman and Eric Allston as class representatives on their own behalf and on behalf of the class of similarly situated students; and

(2)    **DECLARING**, on the basis set forth herein, that:

    A.    the Appeals Panel erred in determining that Amber Blunt's entitlement to compensatory education was limited to one year before the request for a due process hearing was filed, rather than the entire time that she was denied a free, appropriate public education because the District failed to identify her as a student with a disability.

    B.    Defendants violated Defendants violated the IDEA, 20 U.S.C. § 1400 *et seq.*

    C.    Defendants violated Section 504 of the Rehabilitation Act of 1973;

    D.    Defendants violated The Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.*;

    E.    Defendants violated Title VI of the Civil Rights Act;

    F.    Defendants violated Section 1983 of the Civil Rights Act;

    G.    Defendants violated Pennsylvania education law; and

(3)    **ORDERING**, on the basis of the allegations set forth herein, that:

    A.    Lower Merion School District is enjoined from placing African American students in below grade level classes, a modified curriculum and/or in separate, segregated placements whether or not they have a disability;

43

B.      Lower Merion School District shall identify all students who have been previously placed in below grade level classes, a modified curriculum and/or in separate, segregated placements for the years 2000 through the present;

C.      For those students identified by the process set forth in the preceding paragraph who are not already receiving appropriate special education services, Lower Merion School District shall evaluate those students to determine their need for special education services;

D.      Lower Merion School District shall provide appropriate specially designed instruction and related services to members of the class who qualify for such services;

E.      Lower Merion School District shall measure the individual academic progress of the members of the class from year-to-year to determine their progress using the value-added approach adopted by the Pennsylvania Department of Education and identified as the Pennsylvania Value-Added Assessment System (PVAAS) and provide annual reports to the Mainline Branch of the NAACP and the Concerned Black Parents;

F..     For those class members who are not making academic progress, Lower Merion School District shall provide those students with additional academic supports and services as determined by their I.E.P. team and a consultant, not employed by the District but selected by the Mainline Branch of the NAACP and the Concerned Black Parents;

E.      Lower Merion School District shall provide compensatory education to Amber Blunt, Saleema Hall, Walter Whiteman, Lydia Johnson, and Eric Allston and members of the class who were deprived of appropriate special education services as a

44

result of the educational opportunities they have lost through the District's conduct, the award of compensatory education to be equal to the amount of the deprivation;

F.    Lower Merion School District shall pay damages to Plaintiffs in amounts appropriate in light of the egregious deprivation of educational opportunity;

G.    Lower Merion School District shall pay Plaintiff and the class their reasonable attorney fees, expenses and costs, and

I.    Such other and further relief that the Court deems just and proper.

Dated: July 30, 2007                     Respectfully Submitted,

                                         PUBLIC INTEREST LAW CENTER OF
                                         PHILADELPHIA

                                         _____
                                         By:   Barbara E. Ransom, Esquire
                                               Judith A. Gran, Esquire
                                               125 South 9th Street, Suite 700
                                               Philadelphia,  PA  19107
                                               (215) 627-7100
                                               (215) 627-3183

45