IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMBER BLUNT, et al.           :        CIVIL ACTION
                              :
        v.                    :
                              :
LOWER MERION SCHOOL           :
DISTRICT, et al.              :        NO. 07-3100

MEMORANDUM

Bartle, C.J.                                    August 19, 2009

        Plaintiffs Lydia Johnson, Carol Durrell and her
daughters Saleema Hall and Chantae Hall, Christine Dudley and her
son Walter Whiteman, June Coleman and her son Richard Coleman,
Lynda Muse and her daughter Quiana Griffin, as well as two
advocacy organizations, the Mainline Branch of the NAACP
("NAACP") and the Concerned Black Parents of Mainline, Inc.
("Concerned Black Parents") bring this putative class action
against the Lower Merion School District, its Board (collectively
the "School District") and the Pennsylvania Department of
Education ("PDE").[1]  Before the court is the motion of the named
plaintiffs for class certification pursuant to Rules 23(a) and
(b)(2) of the Federal Rules of Civil Procedure.  Defendants
oppose the motion and move to dismiss the claims of Concerned

---

1.  On February 15, 2008, the claims against defendants Jamie
Savedoff, Michael Kelly, Susan Guthrie, Linda Doucette-Ashman,
Gerald Zahorchak, John Tommasini, and the individual members of
the School Board were dismissed.  On November 18, 2008, the
claims of plaintiffs Amber, Crystal and Michael Blunt were
dismissed for lack of subject matter jurisdiction.

Black Parents and the NAACP for lack of standing.  In addition, the PDE argues that all plaintiffs' claims against it are barred as part of a settlement in Gaskin v. Commonwealth of Pennsylvania, No. 09-4048 (E.D. Pa.).[2]

Plaintiffs assert intentional and systematic racial discrimination against African American students with learning disabilities in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., and 34 C.F.R. § 300.600, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, et seq., § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and § 1983 of the Civil Rights Act of 1964, 42 U.S.C. § 1983.  They also claim the PDE has failed in its responsibility to oversee the provision of special education services by the School District for children with disabilities in the Commonwealth of Pennsylvania in violation of the IDEA.

Plaintiffs seek injunctive relief "to ensure that the District properly educate[s] all African American students with disabilities so that they can become literate, valuable, and contributing members of their classroom communities."  They also request compensatory education for those students who were deprived of an adequate education as well as an order requiring

_____

2.  While the PDE asserts in its "Brief of Defendant Pennsylvania Department of Education in Opposition to Plaintiffs' Motion for Class Certification" that all plaintiffs' claims against it are barred, PDE has not filed a specific motion in this regard.  We will treat their assertion as such a motion.

the PDE to monitor whether the School District is correctly identifying African American students with disabilities for placement in special education classes and complying with the IDEA.

The plaintiffs describe the class which they seek to represent, pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, as:

> All present and future African American students in the Lower Merion School District who are denied access to the general education curriculum; are placed in below grade level classes; receive a modified curriculum; and/or are sent to separate, segregated schools that provide them with an education inferior to the education provided their Caucasian peers with and without disabilities.

I.

As noted above, the named plaintiffs are:  (1) several current and former African American students in the School District who have been identified as having a learning disability; (2) the parents of such students; and (3) two advocacy organizations.

In their third amended complaint, plaintiffs assert the School District discriminates against African American students with learning disabilities by making educational placement decisions on the basis of race.  They contend the School District removes African American students from the general education curriculum and places them in separate, lower level classes that are predominantly African American.  They highlight that while

-3-

8.1% of students in the School District are African American, African American students make up 90% to 100% of the students in "modified" or lower level education classes.  They further contend that African American students with disabilities are segregated in greater proportion from the regular curriculum for at least 21% of their day than are their Caucasian peers with disabilities.  Once in the lower level classes, these students with disabilities have no opportunities to re-enter the general curriculum or an educational track that would prepare them for college.  The problem, according to plaintiffs, is compounded by the fact that these students do not receive an appropriate education in the lower level classes.  Instead, they are given passing grades and are graduated, despite the fact that they cannot, in many instances, read or do basic math.

Plaintiffs maintain that the PDE is essentially complicit in the School District's alleged systematic and intentional racial discrimination.  They submit that the PDE has failed in its responsibility under the IDEA to supervise and monitor the School District to ensure that students with learning disabilities within the Commonwealth are provided, among other things, with a free, appropriate public education.

II.

We begin by addressing the School District's argument that neither the NAACP nor Concerned Black Parents has standing to pursue their claims or serve as representatives of the proposed class.  Plaintiffs no longer press to have the NAACP

-4-

certified as a class representative, and the NAACP does not appear to contest that it lacks standing to pursue claims in its own right or on behalf of its members.

According to the third amended complaint, Concerned Black Parents is a non-profit Pennsylvania corporation whose purpose includes the promotion of "equity and excellence in the response of school districts to the needs of diverse student populations; to address issues related to education for populations identified as minority and/or African American; and to identify, monitor, and inform parents about educational issues impacting disadvantaged students, their families and the community at large."  The organization's bylaws specifically state "The Corporation shall have no members."

It is well-settled that the "irreducible constitutional minimum of standing" requires that the plaintiff has suffered an "injury in fact," which our Supreme Court has described as "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent[.]"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Thus, in order to have "independent standing" to sue in its own right, Concerned Black Parents will need to demonstrate it suffered an "injury in fact."  Hill v. Park, No. 03-4677, 2004 WL 180044 (E.D. Pa. Jan. 27, 2004).

The School District maintains that the interests of Concerned Black Parents in the litigation are limited to an ideological or social interest and, therefore, it lacks a

"personal stake in the outcome."  It essentially argues that Concerned Black Parents cannot demonstrate the invasion of a legally protected interest or "injury in fact" necessary to confer standing.

In response, plaintiffs counter that the organization has suffered its own injury in that it has expended its own resources to remedy the harms allegedly caused by the defendants. Plaintiffs cite to the deposition testimony of Loraine Carter, the president of the organization, who testified that members of the board attend meetings on behalf of students who are potential members of the proposed class.  These included "Individualized Education Program" ("IEP") meetings,[3] § 504 meetings,[4] disciplinary meetings, court hearings, and parent-teacher conferences on behalf of students and parents of students enrolled in the School District.  She further explained that the board coordinates public forums for parents in the community,

---

3.  Pursuant to 20 U.S.C. § 1400, et seq., meetings are held regarding a child's IEP by his or her "IEP Team."  Included in these meetings are parents of the child with a disability, at least one regular education teacher of such child, at least one special education teacher or special education provider, a representative of the local educational agency, an individual who can interpret the instructional implications of evaluation results, and, at the discretion of the parent or agency, other individuals who have knowledge of the child.  20 U.S.C. § 1414(d)(1)(B).

4.  A "§ 504 meeting" may be held to determine whether a student is eligible for protection under § 504 of the Rehabilitation Act, to develop a plan that outlines the accommodations that are necessary to meet the student's unique needs, to review annually the student's § 504 plan or to undertake a review before a significant change in educational placement is made.

invites experts to speak, publishes a newsletter on education issues, and meets with community organizations and the School District.  Ms. Carter testified that Concerned Black Parents has met with representatives of the Lower Merion School District to address the underachievement of African American students in the District.  Citing to the budget for the organization, the plaintiffs argue that some of these activities cost money.

Concerned Black Parents, an organization, is not, of course, a student with disabilities in the School District and has not, therefore, suffered the type of injury the named plaintiffs are alleged to have suffered.  Its injuries are more akin to an abstract, ideological interest in the litigation as opposed to the necessary "personal stake in the outcome" of the controversy necessary to confer standing.  Sierra Club v. Morton, 405 U.S. 727, 735 (1972).  The Supreme Court has held that such interests do not meet the "injury in fact" requirement.  In Sierra Club, the plaintiff, a well-known organization dedicated to protecting the environment, sought to enjoin development in the pristine Mineral King Valley in California.  Id. at 730.  It sued as "a membership corporation with 'a special interest in the conservation and the sound maintenance of the national parks, game refuges and forests of the country[.]'"  Id.  The Supreme Court held that it did not have standing since it failed to allege that it would be affected in any of its activities by the development.  Id. at 735.  The Court explained that "a mere 'interest in a problem,' no matter how longstanding the interest

-7-

and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA," the statute under which it sought review.  Id. at 739. While it acknowledged the Sierra Club's historic interest in the protection of the environment, it reasoned that "if a 'special interest' in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization[.]"  Id.  Thus, the "injury in fact" standard "requires that the party seeking review be himself among the injured."  Id. at 735.  Concerned Black Parents, like the Sierra Club, simply has not demonstrated it has suffered an "injury in fact" sufficient to confer standing upon it in its own right.

Alternatively, Concerned Black Parents may have standing to bring a lawsuit on behalf of its members if it can demonstrate:  (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Addiction Specialists, Inc. v. The Twp. of Hampton, 411 F.3d 399, 405 (3d Cir. 2005).

The School District maintains that the organization lacks standing to bring a lawsuit on behalf of its members because, according to the corporation's bylaws and the testimony

-8-

of Loraine Carter, the organization has no members.  Plaintiffs
counter that the organization has an informal membership of
people in the community who consider themselves members.

As noted above, the corporation's bylaws specifically
state "The Corporation shall have no members."  In light of this
express statement in a formal document governing the conduct of
the corporation, we find that it does not have standing to bring
suit on behalf of its members because it has none.  Accordingly,
we will enter an order dismissing Concerned Black Parents from
this lawsuit for lack of standing.

III.

We turn now to the issue of class certification.  Rules
23(a) and (b)(2) of the Federal Rules of Civil Procedure provide:

> **(a) Prerequisites.**  One or more members of a
> class may sue or be sued as representative
> parties on behalf of all members only if:
> (1) the class is so numerous that joinder of
> all members is impracticable;
> (2) there are questions of law or fact common
> to the class;
> (3) the claims or defenses of the
> representative parties are typical of the
> claims or defenses of the class; and
> (4) the representative parties will fairly
> and adequately protect the interests of the
> class.
> **(b) Types of Class Actions.**  A class action
> may be maintained if Rule 23(a) is satisfied
> and if:
>                   *     *     *
> (2) the party opposing the class has acted or
> refused to act on grounds that apply
> generally to the class, so that final
> injunctive relief or corresponding
> declaratory relief is appropriate respecting
> the class as a whole[.]

Our Court of Appeals has warned that class certification "is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." In re: Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 309 (3d Cir. 2009). In conducting a rigorous analysis, we must thoroughly examine the factual and legal allegations relating to the certification issue. Id. Thus, "the decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met." Id. at 307. Factual determinations "supporting Rule 23 findings must be made by a preponderance of the evidence." Id. Additionally, we "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits - including disputes touching on elements of the cause of action." Id.

Initially, defendants suggest that the court will encounter practical problems when attempting to determine which students fall within the class. As noted above, the putative class includes:

> All present and future African American students in the Lower Merion School District who are denied access to the general education curriculum; are placed in below grade level classes; receive a modified curriculum; and/or are sent to separate, segregated schools that provide them with an education inferior to the education provided their Caucasian peers with and without disabilities.

Defendants maintain that the proposed class should not be certified because the class definition includes "subjective and vague" criteria and terms, such as "denied access," "below grade classes," "modified curriculum," and "segregated schools," which will render a decision concerning a particular student's membership in the class impossible.  They further maintain that the class definition, including its use of the word "inferior" to define education, will require the court to determine the merits of each potential class member's claims prior to deciding his/her membership in the class.  Finally, they argue the class definition provides no guidance and does not distinguish between those African American students who have, in actuality, been subject to a "legally impermissible modified curriculum" from those that are genuinely benefitting from their modified curriculum because they cannot academically benefit from the general curriculum.

Aside from these compelling concerns, plaintiffs seek to certify a class including "all African American students" who suffer educational discrimination, even though the allegations in the third amended complaint do not support such an expansive class.  The allegations are directed solely toward "students with disabilities."  The phrase, or a variation of it, permeates the

lengthy and detailed pleading and appears no less than 55 times.[5]
For example, the first paragraph states:

> The Blunt Plaintiffs, African Americans,
> together with seven (7) [sic] other African
> American **students with disabilities**: Lydia
> Johnson; Saleema Hall; Chantae Hall; Eric
> Alston; and, Richard Coleman, their parents,
> and two local organizations - the Concerned
> Black Parents of Mainline, Inc. and the
> Mainline Branch of the NAACP - bring this
> action on their own behalf and **on behalf of
> the class of all similarly situated African
> American students with disabilities** in the
> LMSD who have been denied an appropriate
> education in the least restrictive
> environment without regard to race.

Third Am. Compl., ¶ 1 (emphasis added).

Furthermore, three of the five current claims for
relief are asserted under federal statutes designed specifically
to remedy discrimination against individuals, including students,
with disabilities.  Individuals with Disabilities Education Act,
20 U.S.C. § 1400, et seq. and 34 C.F.R. § 300.600; Americans with
Disabilities Act, 42 U.S.C. § 12132, et seq.; § 504 of the
Rehabilitation Act of 1973, 29 U.S.C. § 794(a).  We conclude that
plaintiffs cannot seek certification of such a broad class which
consists of African American students beyond those with
disabilities.

Even if we would otherwise find that plaintiffs'
proposed class including non-disabled, African American students

---

5.  See Third Am. Compl., ¶¶ 1-2, 4-5, 11, 13-14, 17-18, 20, 28,
37, 43, 45, 49, 52, 55, 57, 60, 63, 66, 68, 74, 80, 92, 97, 100,
112, 123, 126-27, 130, 133, 141-42, 144-45, 148-49, 151, 153,
154, 156-59, 162-66, 167, 169, 173, 175, 181, and 188.

at the School District would be proper, plaintiffs have failed to establish that they satisfy Rule 23(a)(4).  Under that prong of the rule, the plaintiff must demonstrate that the "representative parties will fairly and adequately protect the interests of the class."  Our Court of Appeals has explained that the purpose of this requirement is to "uncover conflicts of interest between named parties and the class they seek to represent."  New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007).  All the named plaintiffs are students *with* learning disabilities.  We do not see how they could fairly and adequately protect the interests of students *without* learning disabilities.  As noted above, several of the statutes under which they are suing are applicable only to those with disabilities.  The interests of these two separate groups simply do not coincide given their different educational needs and circumstances.

Plaintiffs, however, still cannot meet the class certification requirements even if the class is narrowed to those African American students with disabilities.  The first prerequisite that must be satisfied for class certification is found in Rule 23(a)(1), which requires that the class be so numerous that "joinder of all members is impracticable."  Our Court of Appeals has explained that no "minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of class members exceeds 40, the first prong of Rule 23(a)

-13-

has been met."  Stewart v. Abraham, 275 F.3d 220, 227 (3d Cir. 2001).

Plaintiffs rely on statistical evidence to meet their burden of establishing that the requirements of Rule 23 are met. Plaintiffs' expert, Dr. James W. Conroy, Ph.D., a specialist in disability, education and health issues among children and adults, presented statistical evidence that suggests that the School District routinely places African American students in lower level classes that are designed to be less rigorous. Plaintiffs also present statistical data that African American students with disabilities are educated outside of the general education classroom for a greater percentage of their day more so than Caucasian students with disabilities.  Based on these statistics, plaintiffs argue the numerosity threshold is met.

We limit our review to those statistics that focus on the educational placements of students with disabilities. Plaintiffs contend that if African American students with disabilities were included in the regular education classroom in the same proportion as Caucasian students with disabilities, 30 more African American students would have been included in the regular education classroom for at least 80% of their day in the 2005-2006 school year; 19 more African American students would have been so included in the 2006-2007 school year, 27 more African American students would have been so included in the 2007-2008 school year; and 34 more African American students would have been so included in the 2008-2009 school year.

-14-

Plaintiffs have not informed us whether or to what extent these numbers represent the same students. For example, we do not know whether the 34 students in the 2008-2009 school year include the 27 students from the previous year or are in addition to those students. Accordingly, plaintiffs have failed to meet their burden of establishing that the numerosity requirement of Rule 23(a) is met.

Finally, even assuming the requirements of Rule 23(a) were met, plaintiffs have not met their burden under Rule 23(b). Plaintiffs move for certification pursuant to Rule 23(b)(2), which states that a class action may be maintained if Rule 23(a) is satisfied and if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." It is well settled that the class claims must be sufficiently "cohesive" to satisfy this prong because "unnamed members are bound by the action without the opportunity to opt out" and, therefore, may be prejudiced from a negative result. Barnes v. Am. Tobacco Co., 161 F.3d 127, 142-43 (3d Cir. 1998). The cohesiveness requirement also prevents individual issues from overwhelming the litigation because "little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently." Id. at 143. Thus, we have the discretion to deny certification in the presence of disparate factual circumstances.

<u>Geraghty v. U.S. Parole Commission</u>, 719 F.2d 1199, 1205 (3d Cir. 1983).

Disparate factual circumstances predominate here. Plaintiffs and proposed class members are African American students with disabilities who have IEPs under the IDEA.  The central tenet of the third amended complaint is that plaintiffs and putative class members are provided an education inferior to their Caucasian peers.  Analysis of whether an African American student with a disability was deprived of an appropriate education will be highly individualized and dependent upon that particular students' needs, capabilities, and the IEP in place for that child.  These individual determinations, which must be made to determine whether a particular student falls within the class definition and whether such student has a cause of action, weigh against certifying this class.

Moreover, Rule 23(b)(2) contemplates class actions that seek only injunctive and declaratory relief.  Here, plaintiffs request not only injunctive and declaratory relief, but also compensatory education for each of the named plaintiffs and members of the class who were deprived an adequate education.

In <u>McClendon v. Sch. Dist. of Philadelphia</u>, No. 04-1250, 2005 WL 549532 (E.D. Pa. March 7, 2005), the court denied certification of a class of "'all present and future special education students within the Defendant District, who have been or will be subjected to' the de facto practice and policy of

intentionally entering into [IEP] agreements it knows it will breach." Id. at *1.  Judge Sanchez reasoned:

> Each of these students has unique needs and each agreement provided for unique remedies. In their prayer for relief, the parents ask for compensatory damages, which will have to be individually determined if the parents prevail.
>
> \*     \*     \*
>
> In the case at hand, the plaintiffs ask for compensatory relief as well as declaratory and injunctive relief.  Certification of a class would compromise the individual plaintiff's freedom to resolve their individual cases.

Id. at *4.

Here, as in McClendon, the amount of compensatory education necessary for each named plaintiff and class member would require a highly individualized inquiry into that student's unique needs, whether those needs were met, the extent to which the School District failed to provide that student with a free, appropriate public education and the proper amount of compensatory education necessary to redress any deficiencies. The individualized analysis of each student's educational history and needs precludes a finding that a class could be efficiently managed by this court.  General injunctive relief under Rule 23(b)(2) would not be appropriate.

Accordingly, we will enter an order denying the motion of the plaintiffs for class certification.

IV.

Our final inquiry involves the contention of the PDE that the plaintiffs' claims against it are barred by the court-

-17-

approved, class action settlement in the case of <u>Gaskin, et al.</u>
<u>v. Commonwealth of Pennsylvania</u>, 389 F. Supp. 2d  628 (E.D. Pa.
2005).   The PDE asserts that each named plaintiff here
participated as a class member in the <u>Gaskin</u> settlement and that
the settlement agreement in <u>Gaskin</u> was intended to bar the
plaintiffs' claims here.

     <u>Gaskin</u> was instituted by 12 students with disabilities
and 11 disability advocacy groups against the PDE, among others,
pursuant to the IDEA, 20 U.S.C. § 1400, et seq., § 504 of the
Rehabilitation Act, as amended by 29 U.S.C. § 794, and Title II
of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134.
On June 12, 1995, the court certified the following class:

> All present and future school age students
> with disabilities in the Commonwealth of
> Pennsylvania who have been denied the option
> of receiving a free appropriate education in
> regular classrooms with individualized
> supportive services, or have been placed in
> regular education classrooms without the
> supportive services, individualized
> instruction, and accommodations they need to
> succeed in the regular classroom.

     The <u>Gaskin</u> plaintiffs generally alleged that the
defendants "failed to assure that members of the class are
educated with students who do not have disabilities to the
maximum extent appropriate and that those included in the regular
education classroom are not provided with the supplementary aids
and services needed to benefit from participation in the regular
education classroom."

On September 16, 2005, the court in <u>Gaskin</u> approved the
parties' joint motion for final approval of the proposed
settlement agreement.  The settlement agreement was entered into
by and between the individual plaintiffs, the disability advocacy
organization plaintiffs, and the defendants Commonwealth of
Pennsylvania, the PDE, the Secretary of Education, the
Commissioner of Basic Education, the Director of the Bureau of
Special Education and the members of the State Board of
Education.  Pursuant to Provision I.(C), the "individual
plaintiffs are representatives of a certified class consisting of
all school-age students with disabilities in Pennsylvania who
have been denied a free appropriate education in regular
classrooms with individualized supportive services,
individualized instruction, and accommodations they need to
succeed in the regular education classroom."

The settlement agreement is currently in effect.  It
commenced on September 19, 2005 and will terminate exactly five
years later on September 19, 2010.  Under the agreement, the PDE
agreed, among other things, to "require school districts to
adhere strictly to the IDEA, and the case law construing that
statute, when making decisions regarding the placement of
students with disabilities."

The settlement agreement and release further provide:

> In consideration of the performance of PDE's
> obligations under the Settlement Agreement,
> the plaintiffs, individually and collectively
> hereby remise, release, and forever discharge
> each of the defendants [...] from all actions

> and causes of action, suits, grievances,
> debts, dues, accounts, bonds, covenants,
> contracts, agreements, judgments, claims and
> demands whatsoever in law or equity, known or
> unknown, foreseen or unforeseen, particularly
> those <u>which were or could have been set forth
> in</u> *Gaskin v. Pennsylvania Department of
> Education*, No. 94-CV-4048 (E.D. Pa.), or
> which any of the plaintiffs ever had or now
> has, or which that plaintiff's heirs,
> executors, administrators, successors,
> attorneys, or assigns, or any of them
> hereafter can, shall, or may have, for or by
> reason of any cause, matter, or thing
> whatsoever arising out of or related to the
> claims brought by the plaintiffs against the
> defendants in the *Gaskin* case from the
> beginning of the world to the **effective date
> of the Settlement Agreement**[.]

(Emphasis added).

The PDE asserts, and plaintiffs do not dispute, that the named plaintiffs here were members of the class in <u>Gaskin</u>, which included all future school age students with disabilities in the Commonwealth.  According to the PDE, the claims at issue here are the same as those which were or could have been set forth in <u>Gaskin</u>.  Thus, the PDE posits that the parties intended for the settlement agreement and release to bar the class claims asserted here.

Our Court of Appeals in <u>In re Prudential Ins. Co. of Am.</u> held that "a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action." 261 F.3d 355, 366 (3d Cir. 2001).  It noted that this bar by agreement of the parties can extend not only to claims that were not presented but even to those that could not have been presented in the class action.  <u>Id.</u>  The

-20-

court reasoned that this rule promotes "judicial economy by permitting parties to enter into comprehensive settlements that 'prevent relitigation of settled questions at the core of a class action.'" Id.[6]

The PDE is correct that all of the named plaintiffs here were class members in the Gaskin action. The class included "all present and future school age students with disabilities in the Commonwealth of Pennsylvania." The named plaintiffs here were all identified as Pennsylvania students having a learning disability during the time that Gaskin was being litigated.

_____

6. In re Prudential involved a challenge to an order from this district court enjoining two Prudential policyholders from prosecuting a lawsuit in Florida state court. Id. at 361. The plaintiffs were members of a nationwide class of Prudential policyholders who were allegedly victims of deceptive sales practices. Id. Four of the policies plaintiffs purchased from Prudential were eligible for inclusion in the nationwide class action lawsuit. They opted to exclude two of these policies and, instead, brought suit in a Florida state court in connection with them. Id.

The court of appeals held that the district court did not abuse its discretion in enjoining plaintiffs from "engaging in motion practice, pursuing discovery, presenting evidence, or undertaking any other action in furtherance [of their state court action] that is based on, relates to or involves facts and circumstances underlying the Released Transactions in the Class Action." Id. at 363. The court reasoned that the class notice referred to the class release and informed class members that the release encompassed "any matter ... relating in any way directly or indirectly to the sale or solicitation of[] the Policies." Id. at 365. It then specifically noted that it was intended to be very broad. Id. With respect to the release, the court noted that plaintiffs released "Prudential from any claims 'based on,' 'connected with,' 'arising out of,' 'or related to, in whole or in part' their two Class Policies." Id. at 367. As a result of this language, it concluded that the district court did not abuse its discretion. Id. at 369.

The PDE is also correct that the claims for relief asserted in Gaskin are strikingly similar to those brought against it here.  Judge Robreno summarized the plaintiffs claims in Gaskin as follows:

> Plaintiffs claimed that Defendants violated: (1) the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400-1485, by failing to identify disabled students, develop individual education programs or plans ("IEPs"), and provide a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") to the maximum extent reasonably possible; (2) Section 504 of the Rehabilitation Act, as amended by 29 U.S.C. § 794, by excluding disabled students, solely because of their disability, from participating in or from receiving the benefits of any program that received federal funding; and (3) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 - 12134, by excluding otherwise qualified students from access to public programs solely because of their disability.

Gaskin v. Commonwealth of Pennsylvania, 389 F. Supp. 2d 628 (E.D. Pa. 2005).

As in Gaskin, the plaintiffs here claim that the PDE violated the IDEA by failing to identify children with disabilities and provide needed special education and related services and by failing to provide the plaintiffs and members of the putative class a free, appropriate public education.  As in Gaskin, plaintiffs here bring a claim against the PDE under § 504 of the Rehabilitation Act.  They allege the PDE denied the plaintiffs and members of the putative class the opportunity to participate in and benefit from federally-assisted regular

education services, programs, and activities, including special education and related services.  Finally, both the plaintiffs in Gaskin and here asserted a claim against the PDE pursuant to Title II of the ADA because the PDE allegedly denied them the benefits of federally assisted educational programs on the basis of their disabilities.

We acknowledge that in the pending action the plaintiffs claim racial discrimination as the basis for the improper treatment of those with learning disabilities, a claim that was not specifically alleged in Gaskin.  Nonetheless, that was a claim that could have been asserted since the discrimination against the named plaintiffs existed at that time. The PDE was released from all causes of action, including those which could have been set forth in Gaskin.  The allegations underlying the class action settlement in Gaskin and those underlying the causes of action asserted here arise from a "common nucleus of operative facts," that is, discrimination against the learning disabled.  In re Prudential, 261 F.3d at 366.  Thus, to the extent there are claims here that were not brought in Gaskin, these claims, including those asserted under Title VI and § 1983, are barred by the release entered into by the plaintiffs in Gaskin.

Accordingly, we will enter an order dismissing the PDE as a defendant in this case.