# EXHIBIT D

participation in the Title I program as a factor for determining whether to ultimately place that child in special education. SOF ¶ 84.

Thus, not only does LMSD's decision making-process concerning special education placement keep African American students, such as the Plaintiffs, from participating in core classes such as history and science, it also precludes their ability to take higher-level courses. SOF ¶ 89. For instance, in 2008, LMSD offered eleven (11) higher-level courses: Honors, AP, and IB. SOF ¶ 71. Yet, in the years 2005-2008, LMSD enrolled *zero* African American students in twelve of its high-level courses. SOF ¶ 72.

Contrary to LMSD's assertions, the decision making process concerning the *IEP meetings is also problematic for all the reasons previously discussed. Plaintiffs' parents attended IEP meetings under the impression that they would be given an opportunity to offer input regarding the content of their children's CER and IEP. SOF ¶ 93. However, LMSD would present Plaintiffs' parents with an IEP that was already pre-written without the parent's participation. SOF ¶ 94. As previously discussed, LMSD has a custom and practice of instructing Plaintiffs' parents to sign a signature page for their child's IEP *before* the IEP meeting commenced under the guise of a "sign in attendance sheet and often times, the signature page was not attached to the children's actual Comprehensive Evaluation Report ("CER"). SOF ¶ 95. At the IEP meetings, LMSD would not allow the Plaintiffs' parents the opportunity to review their children's CER before or after signing the signature page. SOF ¶ 96. LMSD routinely failed to discuss the CERs with Plaintiffs' parents during the IEP meetings, and routinely failed to send a copy of the CERs to Plaintiffs' parents after the meetings. SOF ¶¶ 97, 98.

In sum, the decision-making process at LMSD regarding psychological testing, special education identification, class placement, and development of IEPs lack transparency; lacks