```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


AMBER BLUNT, et al.            :        CIVIL ACTION
                               :
            v.                 :
                               :
LOWER MERION SCHOOL            :
DISTRICT, et al.               :        NO. 07-3100
```

<u>MEMORANDUM</u>

Bartle, J.                                    October 20, 2011

Plaintiffs Carol Durrell and her daughters Saleema Hall and Chantae Hall, Christine Dudley and her son Walter Jonathan Whiteman, June Coleman and her son Richard Coleman, Lynda Muse and her daughter Quiana Griffin, Eric Allston, and Lydia Johnson bring this action against the Lower Merion School District ("School District") for racial discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and the Civil Rights Act of 1871, 42 U.S.C. § 1983. Before the court is the motion of the School District for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

I.

We may grant a motion for summary judgment only "where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." <u>Azur v. Chase Bank, USA, Nat'l Ass'n</u>, 601 F.3d 212, 216 (3d Cir. 2010) (internal quotation marks omitted);

see also Fed. R. Civ. P. 56(c)(2).  We view the facts and draw all inferences in favor of the non-moving party.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  When ruling on a motion for summary judgment, we may only rely on admissible evidence.  See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

## II.

This action has a long and complex procedural history. On July 30, 2007, plaintiffs filed a putative class action complaint against the Lower Merion School District, its Superintendent Jamie Savedoff, and Director of Pupil Services Michael Kelly.  The original plaintiffs were Amber Blunt, her parents Crystal and Michael Blunt, Linda Johnson, on her own behalf and on behalf of her daughter Lydia Johnson, Carol Durrell, on her own behalf and on behalf of her daughter Saleema Hall, Christine Dudley, on her own behalf and on behalf of her son Walter Jonathan Whiteman, Eric Allston, the Concerned Black Parents, Inc., ("CBP") and the Mainline Branch of the National Association for the Advancement of Colored People ("NAACP"). These plaintiffs sought relief under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.; the Americans with Disabilities Act, 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Title VI, § 1983; and the Pennsylvania Public School Code, 24 Pa. Cons. Stat. Ann. § 1371 et seq.

On September 25, 2007, plaintiffs filed their First Amended Complaint.  This complaint named as additional plaintiffs June Coleman, on her own behalf and on behalf of her son Richard "Ricky" Coleman, and Chantae Hall.  It also included as additional defendants the Lower Merion School Board and its members, the Pennsylvania Department of Education ("PDE"), PDE Secretary Gerald Zahorchak, and Director of the PDE's Bureau of Special Education John Tommasini.  The School District and the PDE filed motions to dismiss the First Amended Complaint for failure to state a claim upon which relief can be granted.  The court granted the motions in part.  It dismissed:  (1) all claims against the individual School District and PDE defendants; (2) all federal law claims of the Blunts; (3) all claims by the CBP and the Mainline Branch of the NAACP; (4) the IDEA, ADA, Rehabilitation Act, and state law claims by the non-Blunt plaintiffs against the School District and the School Board; (5) the § 1983 claims of the non-Blunt plaintiffs to the extent that they were based on the IDEA, ADA, or Rehabilitation Act; (6) all state law claims against the PDE; and (7) all claims of Linda Johnson.

On June 6, 2008, the court granted plaintiffs leave to file a Second Amended complaint naming as an additional plaintiff Lynda Muse, on her own behalf and on behalf of her daughter Quiana Griffin.  Plaintiffs were also granted leave to amend the complaint to rename the CBP and the Mainline Branch of the NAACP as plaintiffs.  Defendants moved to strike the Second Amended

-3-

Complaint on the ground that it included claims that this court had already dismissed.  After a telephone conference, plaintiffs agreed to remove the dismissed claims and filed the Third Amended Complaint on August 5, 2008.  We denied the motion to strike the Second Amended Complaint as moot.  Thereafter, the court granted the motion of the School District, the remaining defendant, to dismiss the still pending claims of the Blunt plaintiffs.

Plaintiffs then moved for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The court denied the motion on August 19, 2009 on the ground that plaintiffs did not demonstrate that they would "fairly and adequately protect the interests of the class" and did not meet numerosity requirements.  See Fed. R. Civ. P. 23(a)(1), (a)(4).  We also dismissed all claims of the CBP and the NAACP for lack of standing and dismissed all claims against the PDE as barred by a prior settlement agreement.  See Gaskin v. Commonwealth of Pennsylvania, 389 F. Supp. 2d 628 (E.D. Pa. 2005).  Plaintiffs filed a petition for leave to appeal the denial of class certification which our Court of Appeals denied on October 22, 2010.  See Blunt v. Lower Merion Sch. Dist., No. 09-8065 (3d Cir. Oct. 22, 2010).  After attempts at mediation failed, we entered our Ninth Scheduling Order which set forth final deadlines for discovery and dispositive motions.

-4-

III.

The following facts are taken in the light most favorable to plaintiffs as the non-moving parties.[1]  Plaintiffs are current or former African American students who were identified as disabled by the School District.  All received special education services while also attending some general curriculum classes.  As discussed above, the IDEA and other claims of plaintiffs have been dismissed.  Plaintiffs' sole claims are for intentional racial discrimination in violation of Title VI and § 1983.

In the Third Amended Complaint, plaintiffs alleged they were "students with disabilities" who were "denied an appropriate education in the least restrictive environment without regard to race."  They also asserted that the School District "routinely misuses so-called below grade level programs and modified classes to remove African American students from the general education curriculum" and "intentionally segregates these African American students."  Plaintiffs sought injunctive relief "to ensure that the [School] District properly educate[s] all African American students with disabilities" and compensatory damages.

In their brief in opposition to the motion for summary judgment, plaintiffs now assert that they are not disabled and

_____

1.  In their original statement of material facts in opposition to the motion for summary judgment, plaintiffs included several "facts" which were wholly unsupported by the record.  After the School District brought this to the attention of the court, plaintiffs submitted a praecipe for correction.

-5-

were wrongly placed in special education programs on the basis of race.  This assertion that they are not disabled is in stark contrast to the Third Amended Complaint, which stated that plaintiffs "Lydia Johnson, Saleema Hall, Chantae Hall, Walter Whiteman, Eric Allston, Ricky Coleman, [and] Quianna Griffin ... are students with a disability within the meaning of the IDEA." In fact, the phrase "student with a disability" or some variation of it appears in the complaint no less than 55 times.[2]  See Blunt v. Lower Merion Sch. Dist., 262 F.R.D. 481, 488 (E.D. Pa. 2009). The School District maintains that plaintiffs' contention that they are not in fact disabled is untimely and outside the scope of the complaint.  Although this argument is persuasive, we will assume for purposes of this motion that plaintiffs with the exception of Chantae Hall and Lydia Johnson are not disabled.[3]

As a result of their alleged wrongful and racially discriminatory identification, plaintiffs now assert in

_____

2.  Additionally, several of the plaintiffs have brought separate IDEA actions in which they were determined to be students with disabilities and never challenged that finding.  Instead, they have accepted awards of compensatory education as students eligible for special education under the IDEA despite their contrary position in the instant litigation.  See, e.g., Lower Merion Sch. Dist. v. R.C., No. 11-5997 (E.D. Pa. Sept. 22, 2011).

3.  The parties agree that Chantae Hall has a learning disability.  In addition, Lydia Johnson does not assert that she is not disabled but rather that she was identified incorrectly as to her specific disability.  She questions whether she is educably mentally retarded as the School District identified her but agrees that a past evaluation demonstrates she has a specific learning disability.

-6-

opposition to the motion for summary judgment that they were denied opportunities to take more challenging classes in preparation for college such as certain science, history, and foreign language classes.  They also assert that they suffered emotional distress.  More generally, plaintiffs state that there is an achievement gap between Caucasian and African American students in the School District.  They point out that a disproportionate number of African American children receive special education services from the School District.  We will address the position of each plaintiff individually.

Plaintiff Saleema Hall was identified as a student with a specific learning disability in elementary school.  She received special education services, including placement in the federally-funded Title I program for additional support in reading.  According to Saleema, the School District psychologist placed her in special education without conducting a legally-required classroom observation.  He also told her family that her initial testing protocols were destroyed, which Saleema later discovered was a lie.

In 2010, Saleema was reevaluated by Umar Abdullah-Johnson, an independent certified school psychologist.  He concluded that Saleema's test scores were within average range, both at the time of her initial testing and his reevaluation.  Johnson opined that there was no reason to suspect that Saleema ever had a learning disability.  After this evaluation, Saleema's

mother removed her from special education.  Saleema is currently enrolled at Lower Merion High School.

Plaintiff Quiana Griffin was determined to be a student with a specific learning disability in reading comprehension and math while in elementary school in Lower Merion.  She was placed in the REACH program, which according to her is "predominantly African American."  That program provides small group reading instruction to students who are below grade level in reading. Quiana's mother unsuccessfully attempted to have her removed from the REACH program when she was in sixth grade.

Quiana continued to receive various other special education services throughout her time in the Lower Merion School District.  However, both her initial and subsequent evaluations showed that she possessed average intelligence.[4]  In high school, Quiana was placed in an instructional support lab.  Quiana's teachers recommended her for both Honors History and Honors Spanish II.  Quiana switched out of these classes with the permission of her mother.  During her senior year, Quiana participated in the PASS class for students at risk of failing Pennsylvania standardized tests.  She maintained that the PASS class was "predominantly African American" and unnecessary

---

4.  The parties dispute the criteria for identifying disabilities.  Plaintiffs' own expert defines a specific learning disability as a "discrepancy between assessed cognitive abilities and assessed academic performance."  Based on this definition, it seems that an individual who possesses average intelligence may nonetheless have a specific learning disability.  However, as discussed above, we will assume that these plaintiffs are in fact not disabled.

because she later earned a proficient score on the statewide reading test. She also asserted that her skills in math declined over time as a result of special education. Quiana was graduated in 2010 and now attends Immaculata University.

Plaintiff Chantae Hall was labeled in second grade as having a specific learning disability in written expression and math. She received special education services for the remainder of her time in the School District, including the Title I reading program, learning support classes, and sessions with a literacy specialist. Chantae noted that one of her special education support classes, her tenth grade Resource class, was 100% African American.

Chantae's mother reported that Chantae complained that her special education classes during high school were "baby work" and "too easy." Chantae also stated that she was kept in special education without receiving a proper reevaluation. However, she concedes that she does in fact have a specific learning disability. Chantae was graduated from Lower Merion High School in 2010 and now attends Harcum College.

Plaintiff Walter Jonathan Whiteman ("Jon") was first evaluated and identified as a student with a learning disability in first grade. The School District later also found that Jon had an emotional disturbance. However, a School District psychologist has found that Jon possesses average intelligence. The School District has admitted that there is no available

-9-

record of the testing protocols used to identify Jon as learning disabled.

Jon attended both Lower Merion High School and later Glen Mills School, an alternative year-round private educational institution.  During high school, Jon took an Active Chemistry class[5] and instructional support labs.  He reported that his English III class was 50% African American and 50% students with disabilities.

Jon's mother had difficulty understanding the paperwork and discussions regarding his educational placement.  She stated in her deposition that she requested the School District cease providing special education services to Jon in elementary school, middle school, and high school.  According to her, she was unaware until Jon was in ninth grade that she could remove him from special education.  She stated that the School District failed to include her in meetings regarding an out-of-district placement and failed to maintain proper records regarding his academic progress.  Jon became frustrated, depressed, and disengaged from academics as time passed and was never graduated from high school.

Plaintiff Richard "Ricky" Coleman began kindergarten in Lower Merion School District in 2004.  In first grade, the School District identified him as having a specific learning disability

_____

5.  "Active" classes are classified as a college preparatory class.  However, no textbook is used in the class, no laboratory period is required, and tests are read aloud.  The School District no longer offers these classes.

and a speech or language impairment.  He was placed in a learning support class during the mornings and general curriculum classes in the afternoon.  His learning support class consisted of three other students--two African American students and one Asian student.  Ricky's mother testified that Ricky was beaten by Caucasian students when in first grade, but admitted that she is unsure what discipline they received.

The Elementary Supervisor for Special Education for the School District conceded that Ricky's initial evaluation did not demonstrate a 15-point discrepancy between his ability and performance levels.  According to Ricky and his parent, this discrepancy was required to demonstrate a specific learning disability.  In response, defendant maintained that there is no such concrete requirement and that identification of a specific learning disability is based on a variety of factors.  Ricky and his mother posit that Ricky was evaluated "prematurely" and that this contributed to his misidentification.

Plaintiff Lydia Johnson was identified as mentally retarded by the School District early in her school career.  Plaintiffs' expert noted that School District records "do not concisely reflect that [Lydia] met the criteria for MR [mental retardation]" but conceded that a reevaluation showed "the presence of an SLD [specific learning disability]."  That expert stated that data is missing from Lydia's files and that the absence of this data "likely caused continued inappropriate placement, which caused [Lydia's] overall academic performance

and outcome to suffer significantly." Lydia affirmed that her courses were not challenging enough and that a special education teacher told her that she would never amount to anything. She was graduated from Lower Merion High School in 2007.

Eric Allston, the final plaintiff, transferred into Lower Merion School District from the Philadelphia School District during sixth grade. At that time, he was found to have a learning disability and attention deficit hyperactivity disorder. He was placed in the REACH program and later in a secondary level emotional support program called the PRIDE program. Eric stated that the REACH program was below his ability level and that as a result he became frustrated. He received help from a therapeutic support staff ("TSS"), a specially trained individual who provides in-class assistance with assignments. He was later placed in a Resource class which was 100% African American.

Eric's guardian requested that Eric be removed from special education and that he receive a private reevaluation. In 2000, Eric was reevaluated by the School District. As part of the reevaluation report, Eric's TSS expressed a belief that Eric did not have a learning disability "based on his observation that, even when Eric appears not to be paying attention, he can most often correctly respond to questions relating to the material covered." The TSS opined that continuing to label Eric as learning disabled had a negative effect on his self-esteem.

-12-

Nonetheless, Eric continued to receive special education services.

Eric attended Harrington High School until the middle of eleventh grade. He then transferred to Lincoln Academy, an alternative school for students with disabilities.[6] He was graduated in 2006. According to Eric he was denied admission at two universities. He was accepted to Philadelphia Community College but chose not to attend. Eric posits that the School District failed to provide sufficient support for emotionally stressful situations in his home life and that this failure rendered him unable to take higher-level courses.

In support of their claims of racial discrimination, plaintiffs rely heavily on statistics. They maintain that the statistics demonstrate there is a disproportionate number of African American students receiving special education services in the School District. Disproportionality is defined as "significantly greater or lower participation in special education by one or more groups compared to the participation rates for other groups." The preferred methods of analyzing disproportionality are risk and relative risk or risk ratio. Risk is calculated by dividing the number of students with disabilities in a particular group by the total number of students in that group. For example, if a school assigned 40 out

_____

6. Plaintiffs refer to Lincoln Academy as a "segregated school." However, they offer no specific evidence regarding the racial composition of that school or how it is in any way inferior to the high schools in Lower Merion.

of 100 African American students to special education the risk
for African American students would be 0.4 or 40%.  The relative
risk is the risk for a specific group divided by the combined
risk for all other groups in the population.  For example, if a
school assigned 40 out of 100 African American students to
special education and 40 out of 200 non-African American students
to special education, the relative risk for African American
students would be 2.0.  This would mean that African American
students were placed into special education at twice the rate of
non-African American students.

Disproportionality is not per se evidence of
discrimination.  As plaintiffs' experts state,
"disproportionality can be either biased or unbiased."  Under
federal regulations, each state must collect data to determine if
significant disproportionality based on race or ethnicity is
occurring in the identification and placement of children with
disabilities.  See 34 C.F.R. § 300.646(a).  If such
disproportionality based on race or ethnicity is found to exist,
the state must review and revise the policies and practices used
in the identification process to ensure that such
disproportionality ceases.  Id. at § 300.646(b).

There is no specific numerical criteria for
disproportionality set forth in the IDEA or federal regulations.
Instead, states have established guidelines at their discretion.
The Pennsylvania Department of Education uses a
disproportionality risk ratio of 3.0, that is, three to one.

-14-

Plaintiffs' expert states that the United States Department of Education has reported that a disproportionality risk ratio of 1.5 indicates over-representation of that race.  The Department has identified several factors that contribute to disproportionality, which include:  (1) ineffective academic curriculum and behavioral supports; (2) inadequate instructional and classroom management skills; (3) poor support and referral systems for at-risk students; (4) insufficient supports for teachers working with culturally diverse groups; (5) racial and ethnic factors which contribute to the incorrect placement of children from racial and ethnic minorities in special education class; (6) effects of poverty; (7) limited English proficiency; and (8) residence in inner cities.  These factors demonstrate that complex and varied forces contribute to disproportionality and it is not per se evidence of intentional discrimination.

In 2005, the Pennsylvania Department of Education found that there was a disproportionate number of African American students in special education programs in Lower Merion.  The next year the Department issued a report closing the investigation. It found that the School District's "percentage of children with disabilities served in special education is comparable to state data" and commended the District for its efforts.  It also concluded that the School District met targets regarding "disproportionate representation by race/ethnicity" in special education services in 2007, 2008, and 2009.  The disproportionality risk ratio for African American students was

approximately 1.8 during the 2007-2008 school year and 1.7 during the 2010-2011 school year.

In the 2005-2006 school year, there were 6945 students enrolled in the School District.  Of that total, 84.4% or approximately 5861 were Caucasian.  7.7% were African American.  1,255 or 18.1% of the student body received special education services.  12.7% or approximately 156 of the special education students were African American.  82.6% were Caucasian.  32.6% of all African American students in the School District had individual education plans ("IEPs").

In the 2006-2007 school year, there were 6,981 students in the School District.  Of that total, 7.9% or approximately 500 students were African American.  83.2% of all students were Caucasian.  1,187 or 17% of the total student body received special education services.  14.5% or approximately 160 of the students receiving special education were African American and 80.2% were Caucasian.  Approximately 30% of all African American students enrolled in the School District had IEPs.

In 2007-2008, the School District had 6,914 students.  8.1% were African American and 83.1% were Caucasian. 1,158 or 16.7% of all students received some form of special education services.  14% of the students receiving special education were African American and 80.8% were Caucasian.

In the 2008-2009 academic year, 6,788 students attended school in Lower Merion.  African Americans accounted for 8% of all students and Caucasians represented 81.6% of all students.

-16-

1,101 or 16.2% of the student body were classified as special education students.  13.7% of special education students were African American and 80.5% were Caucasian.

In the 2009-2010 academic year, 7,072 students were enrolled in the School District.  8.6% of all students were African American and 81.1% were Caucasian.  1,094 or 15.5% of all students received special education services.  Of that number, 14.3% of special education students were African American and 80% were Caucasian.

The plaintiffs also offer evidence of the racial composition of classes for courses with more than 30 students. In 2008, the dozen courses with the highest proportion of African American students ranged from 29.4% to 45.5% African American. These courses included Geometry Lab, Selected Topics in Algebra, Active Chemistry, PASS, Algebra Lab, Mathematics, Intermediate Spanish, Intro to Algebra Supplement, and several instructional support labs.  According to plaintiffs' expert James W. Conroy, Ph.D., these are "low expectations" courses.  The dozen courses in 2008 with the lowest proportion of African American students included Community Service Learning, Latin III Honors, AP Calculus, Economics Honors, Art II Honors, and several other Advanced Placement and International Baccalaureate level classes. These courses had no African American students.  In 2005, 2006, and 2007, the courses with the highest percentage of African American students ranged from 23.4% to 54.5% while some courses had no African American students.  These courses were similar in

-17-

level of difficulty to the courses with the highest and lowest
proportion of African American students in 2008.

IV.

We first consider plaintiffs' claims under Title VI.
That statute provides that:

> No person in the United States shall, on the
> ground of race, color, or national origin, be
> excluded from participation in, be denied the
> benefits of, or be subjected to
> discrimination under any program or activity
> receiving Federal financial assistance.

42 U.S.C. § 2000d.

To make out a prima facie case under Title VI,
plaintiffs must show that:  (1) they are members of a protected
class; (2) they were qualified to continue in pursuit of their
education; (3) they suffered an adverse action; and (4) such
action occurred under circumstances giving rise to an inference
of discrimination.  See, e.g., Sarullo v. U.S. Postal Serv., 352
F.3d 789, 797 (3d Cir. 2003).  Evidence that a similarly-situated
student outside the protected class was treated differently may
raise an inference of discrimination.  See Manning v. Temple
Univ., No. 03-4012, 2004 WL 3019230, at *5 (E.D. Pa. Dec. 30,
2004) (citing Bell v. Ohio State Univ., 351 F.3d 240, 252-53 (6th
Cir. 2003)).  However, a lack of comparative evidence is not
fatal to a plaintiff's prima facie case.  Anderson v. Wachovia
Mortg. Corp., 621 F.3d 261, 272-74 (3d Cir. 2010); Pivirotto v.
Innovative Sys., Inc., 191 F.3d 344, 352-54 (3d Cir. 1999).
Instead, the prima face case is "flexible and must be tailored to

fit the specific context in which it is applied." Sarullo, 352 F.3d at 797 (citing Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)).  Comparative evidence is just one manner in which a plaintiff can satisfy the prima facie requirement that the adverse action occur under circumstances giving rise to an inference of discrimination.  Anderson, 621 F.3d at 273.

        If plaintiffs establish a prima facie case, the burden will shift back to the School District to put forth a legitimate, nondiscriminatory reason for their actions.  Manning v. Temple Univ., 157 F. App'x 509, 513-14 (3d Cir. 2005) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Once the defendant proffers a nondiscriminatory reason, the plaintiff must come forward with direct or circumstantial evidence from which a jury could reasonably:  "(1) disbelieve the articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the action."  Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996).

        The Supreme Court has held that there is no private cause of action for disparate impact under Title VI.  Alexander v. Sandoval, 532 U.S. 275, 280 (2001).  In Sandoval, plaintiffs brought an action challenging Alabama's policy of administering driver license examinations only in English.  Id. at 278-79.  The Court held that it was "beyond dispute" that "'Title VI itself directly reach[es] only instances of intentional

discrimination.'"  Alexander v. Sandoval, 532 U.S. 275, 280
(2001) (quoting Alexander v. Choate, 469 U.S. 287, 293 (1985)).

        Our Court of Appeals thereafter examined the
requirement of intentional discrimination under Title VI in Pryor
v. National Collegiate Athletic Association.  288 F.3d 548 (3d
Cir. 2002).  The plaintiffs in Pryor were African American
prospective college students who challenged the National
Collegiate Athletic Association's use of a minimum grade point
average and the Scholastic Assessment Test to determine
eligibility for athletic scholarships.  Id. at 552-53.  The
students alleged that the defendant's use of this policy in the
face of knowledge that it would have a disproportionate impact on
African American students constituted intentional discrimination.
Id.  Our Court of Appeals concluded that these allegations were
sufficient to state a claim under Rule 12(b)(6) of the Federal
Rules of Civil Procedure and reversed the district court's
decision granting the motion to dismiss.  In doing so, the Court
of Appeals relied on the "no set of facts" standard as set forth
in Conley v. Gibson.  355 U.S. 41, 46 (1957).  We note that this
ruling occurred before the Supreme Court set forth a more
exacting pleading standard in Bell Atlantic v. Twombly, 550 U.S.
544, 570 (2007) and Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949
(2009).

        The Court of Appeals recognized that "considering
evidence of impact would seem to contradict the principle that no
claim for disparate impact lies under Title VI."  Id. at 563

-20-

(citing Gen. Bldg. Contractors Assoc. v. Pennsylvania, 458 U.S. 397 (1982)).  However, evidence of disparate impact may serve as an "important starting point" for determining the existence of intentional discrimination.  Id. at 563 (quoting Arlington Heights v. Metro Housing Dev. Auth., 429 U.S. 252, 266 (1977)). The court reasoned that the "'impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions.'"  Id. (quoting Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 487 (1997)).  Other relevant considerations include "'the historical background of the ... decision; [t]he specific sequence of events leading up to the challenged decision; [d]epartures from the normal procedural sequence; and ... contemporary statements by members of the decisionmaking body.'" Id. (quoting Arlington Heights, 429 U.S. at 267-68).

        Nonetheless, statistical evidence alone is not sufficient to create a prima facie case under Title VI.  Pryor, 288 F.3d at 562.  As discussed above, plaintiffs rely heavily on statistical evidence of racial disproportionality in special education and other classes to raise an inference of discrimination.  Plaintiffs' own experts concede that disproportionate participation in special education by African American students is not in and of itself problematic.  They state that "[t]he unequal treatment of equals could be completely legitimate.  If more black students need special education services, they should receive it....  The relevant question here

-21-

is whether blacks are *unfairly* assigned as disabled."  We agree.
Consequently, we must examine the record for evidence sufficient
to raise a genuine issue of material fact as to discriminatory
intent on the part of the School District.

Plaintiffs first allege that the School District
committed various improprieties in regard to their identification
as students with disabilities, including:  (1) destroying testing
protocols; (2) failing to obtain parental permission before
conducting evaluations; (3) neglecting to notify parents
regarding procedural safeguards available to them under the IDEA;
(4) failing to provide draft individual educational plans
("IEPs") to parents; (5) omitting information from evaluation
reports and IEPs; (6) failing to conduct proper and timely
reevaluations; (7) obtaining parental consent without providing
all relevant documents; and (8) evaluating students to determine
their eligibility for services under the IDEA without conducting
classroom evaluations.

Evidence of procedural irregularities such as these may
raise an inference of discriminatory intent.  E.g., Stern v.
Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997).
However, there must be some evidence that the irregularities were
related to plaintiffs' race.  See E.E.O.C. v. Muhlenberg Coll.,
131 F. App'x 807, 812 (3d Cir. 2005); Bickerstaff v. Vassar
Coll., 196 F.3d 435, 452 (2d Cir. 1999).  To infer that these
seven student plaintiffs were discriminated against merely
because they suffered an adverse action and are members of a

-22-

protected class would render the prima facie requirement of
intent meaningless.  Here, plaintiffs offer no evidence that the
errors on the part of the School District were causally connected
to the plaintiffs' race.  While plaintiffs may have a cause of
action under the IDEA, the errors shown here do not advance
plaintiffs' case that they were subjected to intentional racial
discrimination.[7]

Several plaintiffs state that they were subject to
racial discrimination.  For instance, Quiana Griffin alleges that
her educational placement was racially motivated.  She asserted
that Caucasian students in her instructional support lab class
received more help from the teacher than African American
students.  Quiana also testified in her deposition that she
believes she was placed into two special education programs
because "a lot of African American kids were in [those classes]."
However, she admitted that there is nothing else to support her
belief that she was subject to racial discrimination.

Lydia Johnson similarly believes that she was treated
differently from Caucasian students.  She stated that the School
District "went on assumptions" when identifying her as disabled
and that it placed her in special education because of her race.
She offers no support for these assertions, except that:  (1) she

---

7.  To the extent that these actions constitute violations of the
IDEA, plaintiffs' allegations under that statute were previously
dismissed for failure to exhaust administrative remedies and are
not properly before this court.  See Blunt, et al. v. Lower
Merion Sch. Dist., 559 F. Supp. 2d 548, 557-60 (E.D. Pa. 2008).

-23-

was told to do her school work while other Caucasian students
were allowed more options for activities, such as playing or
watching movies; and (2) she was told she could not participate
in a vocational-technical program because she was in special
education.  She conceded that there is no other basis for her
belief that the School District made decisions regarding her
educational placement on the basis of race.  Likewise, Jon
Whiteman's mother commented that her son was placed in special
education because of his race but that her only support for this
conclusion was that "they do that with all African-Americans."

Plaintiffs' beliefs and conclusory assertions are
insufficient to defeat summary judgment.  To defeat a motion for
summary judgment, "a party must present more than just 'bare
assertions, conclusory allegations or suspicions' to show the
existence of a genuine issue." Podobnik v. U.S. Postal Serv.,
409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp. v.
Catrett, 477 U.S. 317, 325 (1986)).  A "subjective belief of
discrimination, however genuine, [cannot] be the basis of
judicial relief." Elliott v. Group Med. & Surgical Serv., 714
F.2d 556, 567 (5th Cir. 1983); see also Chappell v. GTE Prods.
Corp., 803 F.2d 261, 268 (6th Cir. 1986).  Accordingly, these
statements have no evidentiary weight and must be disregarded.

Plaintiffs point out that since 1997, the School
District has not had an African American Superintendent,
Assistant Superintendent, Director of Student Services, Director
of Pupil Services, or Special Education Advisor.  From 2006-2010,

-24-

only two special education teachers at Lower Merion High School were African American.  Plaintiffs have not offered any evidence regarding the number of African American teachers and administrators in the local labor market.  In any event, there is no requirement that a school make hiring decisions based on the racial makeup of its student body.  See Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274 (1986).  The facts before us without more are not probative of whether the School District has intentionally discriminated against the plaintiffs on the basis of race.

During oral argument, plaintiffs also relied on the deposition of Barbara Moore-Williams, Ed.D., who is an educational consultant hired by the School District to improve minority achievement.  Plaintiffs cite to parts of her deposition where Moore-Williams testified that the School District discriminated against African Americans.  However, plaintiffs' use of this testimony is selective and misleading.  Moore-Williams actually states that there is racism in all school districts and that Lower Merion School District's problems are no different from any other suburban school district.  She also admits that her statements about the School District are not based on anything she observed firsthand but rather on her own personal belief and the hearsay statements of others.  Accordingly, her statements cannot create a genuine issue of material fact regarding the School District's intent to discriminate.

-25-

Plaintiffs also rely on a document produced by the School District in discovery labeled "Minority Achievement Program Presentation," which is dated October 2010. This document lists alleged characteristics of African American students, including a preference for "tactile learning" and "[s]ubdued lighting," that they "[r]ely heavily on visual input rather than auditory input," and that they "[r]eact intensely to being praised or criticized." Notably, the record does not reveal who created this document or under what circumstances and what position the creator or creators occupied within the School District. There is no evidence that the purported presentation was ever used.

In Gebser v. Lago Vista Independent School District, the Supreme Court considered whether a School District can be held liable for the acts of its teachers through respondeat superior liability under Title IX. 524 U.S. 274, 283-87 (1989). The Court answered in the negative and concluded that plaintiffs must adduce evidence that the School District had actual knowledge of the alleged discrimination. Id. Although Gebser involved an action under Title IX, the Supreme Court has stated that "Title IX was patterned after Title VI.... Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited [sic] class." Cannon v. Univ. of Chicago, 441 U.S. 677, 694-95 (1979). Without evidence that the document was created with the authorization of

-26-

the School District or that the School District had actual
knowledge of any presentation, any discrimination that can be
inferred from its creation or presentation cannot be imputed to
the School District.

        Ricky Coleman's mother observed Ricky's first grade
class and witnessed the teacher treating African American
students in a disparaging manner.  Ms. Coleman met with the
principal, who advised her that such behavior would not be
tolerated in the school and that the teacher would be
disciplined.  According to plaintiffs, the teacher received
sensitivity training over the summer.  Ricky's mother was
dissatisfied with this result.  She contacted other African
American parents to voice her frustration and to ensure that the
teacher would not have any African American students in her class
the next year.  For the reasons discussed above, this evidence is
insufficient under Title VI.  The School District cannot be held
liable for the acts of a teacher, absent evidence that a School
District official with "authority ... to institute corrective
measures on the recipient's behalf has actual knowledge of
discrimination ... and fails to adequately respond."  Gesber, 524
U.S. at 290.  Plaintiffs have not offered any evidence of
discriminatory behavior on the part of that teacher towards them
after the sensitivity training.  There is no reason to infer that

the School District's response was inadequate merely because it was not the exact course of action desired by Ms. Coleman.[8]

In her deposition, Ms. Coleman offered several anecdotes which allegedly demonstrate hostility towards African American students in the School District.  She testified that a consultant who apparently observed Ricky's class told her about his teacher's "racist" behavior.  Finally, she recounted several incidents where African American students allegedly received harsher discipline than their Caucasian peers.  These statements are not based on first-hand knowledge and are hearsay.  Accordingly, they will be disregarded for purposes of this motion.

Plaintiffs must produce evidence that:  (1) they are members of a protected class; (2) they were qualified to continue in pursuit of their education; (3) they suffered an adverse action; and (4) such action occurred under circumstances giving rise to an inference of discrimination.  See, e.g., Sarullo, 352 F.3d at 797.  Even assuming that plaintiffs have produced evidence of the first three elements, there is no direct or circumstantial evidence of intentional racial discrimination by the School District.  Plaintiffs simply have not put forth any evidence that supports their contention that they were

---

8.  Evidence would be available in any case only as to plaintiff Ricky Coleman.  No other plaintiff has stated that he or she was assigned to the class of this particular teacher.

-28-

"segregated" intentionally into inferior educational programs in violation of Title VI.

From what the record shows it may not be inferred that the School District provided different special education services based on race or committed the alleged errors in the identification and placement of students only as to those who are African American.  Plaintiffs speculate that they were treated differently on the basis of race yet come forward with nothing to support these assertions.  We emphasize that this is not an action under the Individuals with Disabilities Education Act. Plaintiffs cannot merely produce evidence that their rights were violated under that statute or that they are unhappy generally with the education they received or are receiving.  Instead, they must raise at least some reasonable inference that they were placed into classes and offered services by the School District due to intentional discrimination based on their race and not simply due to errors in evaluation.

Although several plaintiffs state that they were placed in classes which were 100% African American, the record shows that the vast majority of classes in the School District are made up of students of different races and that over 80% of the special education students in the School District were Caucasian. As stated above, plaintiffs cannot rely on evidence of disproportionality alone.  Plaintiffs' experts admit that disproportionality "can be biased or unbiased."  They state that "[t]he unequal treatment of equals could be completely

-29-

legitimate.  If more black students need special education services, they should receive it."  We cannot infer that plaintiffs were wrongfully placed in special education because of their race based on the statistics offered by plaintiffs.  Title VI does not require a particular racial balance in each classroom or program.  See, e.g., Milliken v. Bradley, 418 U.S. 717, 740-41 (1974).

Accordingly, the motion of defendant for summary judgment as to plaintiffs' Title VI claims will be granted.

V.

We next turn to the claims of plaintiffs under 42 U.S.C. § 1983.  That section provides:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State or Territory or the District of
> Columbia, subjects, or causes to be
> subjected, any citizen of the United States
> or other person within the jurisdiction
> thereof to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured.

Under § 1983, plaintiffs must demonstrate:  (1) "a violation of a right protected by the Constitution;" and (2) that the violation "was committed by a person acting under the color of state law." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000).  Here, the plaintiffs allege a violation of the Equal Protection Clause of the Fourteenth Amendment.  See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1079 (3d Cir. 1990).

Section 1983 requires proof of a purposeful discrimination.  See, e.g., Commonwealth of Pennsylvania v. Flaherty, 983 F.2d 1267, 1273 (3d Cir. 1993) (citing Washington v. Davis, 426 U.S. 229, 238-39 (1976)).  The Supreme Court has instructed that:

> "Discriminatory purpose" ... implies more
> than intent as volition or intent as
> awareness of consequences.  It implies that
> the decision maker ... selected or reaffirmed
> a particular course of action at least in
> part "because of," not merely "in spite of,"
> its adverse effects upon an identifiable
> group.

Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979). Like the requirements under Title VI, evidence that the actions of the defendant had a disproportionate effect on African Americans is not sufficient.  See Arlington Heights, 429 U.S. at 264-65.  Instead, plaintiffs must demonstrate that the School District took an adverse action against them under circumstances giving rise to an inference of discrimination.  Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992) (citing Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)).

It is well established that liability in a § 1983 action "cannot be predicated solely on the operation of respondeat superior."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (emphasis omitted).  Plaintiffs must demonstrate that a policy, practice, or custom of the School District was a determinative factor in the alleged discrimination.  Black v. Indiana Area Sch. Dist., 985 F.2d 707, 712 (3d Cir. 1993).  To

-31-

show a policy, a plaintiff must establish that a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issue[d] an official proclamation, policy, or edict." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (quoting Andrews, 895 at 1480). A custom, on the other hand, is "a given course of conduct, although not specifically endorsed or authorized by law, [that] is so well-settled and permanent as virtually to constitute law." Id. (citing Andrews, 895 F.2d at 1480). The School District can be liable for failing to act only where that inaction constitutes deliberate indifference to the rights of the plaintiffs. City of Canton v. Harris, 489 U.S. 378, 390-91 (1989); Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989).

For many of the same reasons that plaintiffs' Title VI claim fails, plaintiffs have not raised a genuine issue of material fact regarding their § 1983 cause of action. As previously stated, plaintiffs cannot simply rely on evidence of racial disproportionality in special education to establish discrimination in violation of the Equal Protection Clause. See Davis, 426 U.S. at 238-39. Plaintiffs have not put forth "more than a scintilla" of evidence that the School District acted with a racially discriminatory purpose when identifying them as disabled and offering them special education services, even if this identification was somehow incorrect. E.g., Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989).

-32-

Even assuming that plaintiffs put forth evidence that their constitutional rights were violated, there is no evidence that the School District did so based on an official policy or custom or that it was deliberately indifferent to plaintiffs' rights.  Plaintiffs assert that the School District has failed to investigate whether African American students were over-assigned to special education programs and to narrow the achievement gap between Caucasian and African American students.  They also point to the fact that the School District formed a committee to address the concerns of African American parents.  From this plaintiffs wish the court to infer that the School District has knowledge of racism in its schools and yet has failed to act.

The School District's awareness of an "achievement gap" between Caucasian and African American students and its failure to eliminate that gap is not evidence of intentional discrimination or deliberate indifference.  See, e.g, Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 330-32 (4th Cir. 2001); Coalition to Save Our Children v. State Bd. of Educ. of Del., 90 F.3d 752, 776-77 (3d Cir. 1996).  We refuse to infer otherwise merely because the School District's committee has not been successful in alleviating the concerns of plaintiffs.  Moreover, it is insufficient to point to things the School District "could have done" to prevent the alleged constitutional violation under § 1983.  Canton, 489 U.S. at 391-92.  None of the plaintiffs' allegations are sufficient to create a genuine issue

-33-

of fact regarding whether the School District was indifferent to the plaintiffs' rights.

Accordingly, the motion of defendant for summary judgment as to the § 1983 claims of plaintiffs will be granted.[9]

---

9.  Plaintiffs have filed a motion to exclude a portion of the defense expert report prepared by Daniel Reschly, Ph.D.  In the portion of the report at issue, Dr. Reschly conducted a comparison of the plaintiffs' files with those of certain Caucasian students selected by the School District.  Because we have not considered that portion of the report in granting the motion for summary judgment, we will deny the motion to exclude as moot.